**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Aaron Keith LOVETT, Defendant–
Appellant.**

No. 91–6088.

United States Court of Appeals,
Tenth Circuit.

May 19, 1992.

Susan L. Foreman, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, with her on the briefs), for defendant-appellant.

James F. Robinson, Asst. U.S. Atty., Oklahoma City, Okl. (Timothy D. Leonard, U.S. Atty., with him on the brief), for plaintiff-appellee.

Before ANDERSON, ALDISERT[*] and TACHA, Circuit Judges.

TACHA, Circuit Judge.

On December 20, 1990, a jury convicted the defendant, Aaron Keith Lovett, of nine counts of Interstate Transportation of Fraudulently Obtained Funds in violation of 18 U.S.C. § 2314, fifteen counts of Monetary Transactions in Property Derived from Unlawful Activity in violation of 18 U.S.C. § 1957, and four counts of Money Laundering in violation of 18 U.S.C. § 1956. In addition, the jury ordered the forfeiture of the items of property described in Counts 31–35 pursuant to 18 U.S.C. § 982. On appeal, the defendant argues that (1) there is insufficient evidence of concealment or disguise to support his conviction on each of the four money laundering counts; (2) as to six of the fifteen counts alleging a violation of 18 U.S.C. § 1957(a), the evidence of exchange is insufficient to support his conviction; (3) evidence of interstate commerce is insufficient to support federal jurisdiction for eight of the fifteen counts that alleged a violation of § 1957(a); (4) the judge failed to properly instruct the jury on the fifteen counts that alleged a violation of § 1957(a); (5) evidence of fraud is insufficient to support a conviction on each of the nine counts alleging violations of 18 U.S.C. § 2314; (6) even if evidence of fraud is sufficient, the defendant should have been convicted of only five counts of violating § 2314; (7) the district court violated the defendant's rights against double jeopardy by imposing separate judgments and convictions for the § 2314 counts and the § 1957 counts; and (8) the district court erred by ordering the defendant to pay special assessments on the forfeiture counts. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm in part and reverse in part.

## I.

Viewed in the light most favorable to the government, the record reveals the following facts. When Aaron Keith Lovett was only two years old, he lost contact with his paternal grandmother, Rubylea Hall. Years later, in 1985, Lovett was reunited with his grandmother, who was living alone in Wichita Falls, Texas. Mrs. Hall maintained at least ten bank accounts in Wichita Falls, with a combined balance exceeding $300,000. By July 31, 1990, only $2,200 remained in one checking account. The rest of the money—approximately $316,000—had been moved from Mrs. Hall's accounts in Texas to her grandson's accounts in Oklahoma.

Lovett visited Mrs. Hall regularly between 1985 and 1990. Mrs. Hall placed Lovett's name on some of her bank accounts, but she retained control of the accounts. In April, 1990, Mrs. Hall signed a power of attorney that gave Lovett authority over $21,000 held in her retirement fund at Rolling Meadows Retirement House. This same month, Mrs. Hall learned she had colon cancer and needed surgery. On April 27, 1990, Mrs. Hall executed a will, leaving the bulk of her estate to Lovett upon her death. Anticipating that she might become incapacitated, Mrs. Hall authorized changes on several of her accounts before undergoing surgery. She added Lovett's name to several of her checking accounts and certificates of deposit. After the surgery, Lovett insisted that Mrs. Hall return with him to his house in Oklahoma City to recuperate. Mrs. Hall intended to stay no more than a week, but ended up staying several months.

While Mrs. Hall was staying with him, Lovett withdrew almost all of the money from her accounts. He accomplished these

[*] Ruggero J. Aldisert, Circuit Judge of the United States Court of Appeals for the Third Circuit, sitting by designation.

withdrawals both personally—for the accounts on which Mrs. Hall had previously made him co-owner—and also by utilizing letters signed by Mrs. Hall directing the banks to close her accounts and release the money to Lovett. Altogether, Mrs. Hall signed eight letters of withdrawal. At trial, however, Mrs. Hall denied ever signing documents allowing the transfer of her funds. She testified that Lovett had her sign several documents and told her that they were Medicare payments or other "non-important" documents. Mrs. Hall was nearly blind and could not see or read anything that she was asked to sign.

Lovett deposited the money withdrawn from Mrs. Hall's accounts into two accounts in Oklahoma City. Lovett then transferred much of the money to six additional accounts at six different banks in Oklahoma City. None of the accounts listed Mrs. Hall as the owner. Instead, the accounts listed Lovett and his wife as owners. Lovett made several large purchases with the funds; he purchased a house, a 1990 GMC Suburban, a 1990 GMC Sierra pickup truck and a large gold and diamond ring.

Internal Revenue Service agents detected Lovett's actions when he made multiple cash transactions at five Oklahoma City banks. Criminal charges were presented to the grand jury. Counts 2–10 of the indictment against Lovett charged him with transporting monies obtained by fraud from Texas to Oklahoma in violation of 18 U.S.C. § 2314. For depositing the funds into Oklahoma banks, and for subsequent transfers of the funds to other Oklahoma banks, Lovett was charged in Counts 11–15 and 17–26 with violating 18 U.S.C. § 1957. Counts 27–30 charged Lovett with laundering the fraudulently obtained funds through the purchase of a house, a GMC Suburban, a GMC pickup truck and a ring.

Counts 31–35 sought the forfeiture of the properties that Lovett purchased with illegally obtained monies.

## II.

■ Lovett challenges the sufficiency of the evidence related to Counts 27, 28, 29 and 30, which charged him with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).[1] Our review of the sufficiency of the evidence to support a criminal conviction is limited to whether "[t]he evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—is sufficient ... when taken in the light most favorable to the government" for a reasonable jury to find the defendant guilty beyond a reasonable doubt. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986). We must find that substantial evidence supports the conviction; " 'that is, [the evidence presented to support the conviction] must do more than raise a mere suspicion of guilt.' " *United States v. Sanders*, 929 F.2d 1466, 1470 (10th Cir.) (quoting *United States v. Brandon*, 847 F.2d 625, 630 (10th Cir.), *cert. denied*, 488 U.S. 973, 109 S.Ct. 510, 102 L.Ed.2d 545 (1988)) (further citations omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991).

Lovett's money laundering convictions are based on four separate purchases: a GMC pickup truck (Count 28), a house (Count 29), a GMC Suburban (Count 27), and a ring (Count 30). Lovett argues that there is insufficient evidence that these four purchases were transactions designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." *See* § 1956(a)(1)(B)(i). Based on our holding in

---

1. The statute provides:
   Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—...
   (B) knowing that the transaction is designed in whole or in part—

   (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; ...
   shall be sentenced to a fine ... or imprisonment for not more than twenty years, or both.
   18 U.S.C. § 1956(a)(1)(B)(i).

*United States v. Sanders*, 929 F.2d 1466 (10th Cir.1991), Lovett argues that because he participated personally in every transaction, paid with a personal check unless otherwise required, and conspicuously utilized all of the items purchased,[2] we must reverse each of his money laundering convictions for lack of evidence of intent to "disguise the relationship of the item purchased with the person providing the proceeds." *Id.* at 1472.

In *Sanders*, we reversed the money laundering convictions of a defendant who used the proceeds of a drug transaction to purchase two cars. *Id.* Because the defendant and her husband personally purchased the cars, were readily identified by the salesperson, and conspicuously used both cars, we held that there was insufficient evidence of concealment. *Id.* at 1471–72. We rejected the government's suggestion that the money laundering statute should be "broadly interpreted to include all purchases made by persons with knowledge that the money used for the transaction represents the proceeds of illegal activity." *Id.* We noted that

> the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities.

*Id.* at 1472.

### A. The Pickup Truck

■ The defendant purchased the pickup truck for his brother, James Lovett, on July 30, 1990. Together, the brothers selected the pickup at the Jackie Cooper Olds/GMC dealership. The defendant personally negotiated the sales price with the salesman—the same salesman from whom he purchased a GMC Suburban several days earlier. The defendant, himself, then tendered a personal check, drawn on his account at Local Federal Savings & Loan, for the full purchase price of $18,426.52.

The trial transcript reveals several facts that distinguish the purchase of the pickup from the purchase of the cars in *Sanders*. According to James Lovett's testimony, the defendant specifically instructed James not to tell their grandmother (Mrs. Hall) about the purchase of the pickup. James further testified that long before the purchase of the truck—while their grandmother was still staying at the defendant's house—James called the defendant to inquire about their grandmother. James and the defendant argued on the phone. James testified that he "knew that ... grandmother shouldn't be down there" and that he "didn't know what [the defendant] was doing." Consequently, James threatened to bring an attorney and an accountant "in on the deal" to investigate. James testified that, at the time he made this threat, he did not know that the defendant had taken Mrs. Hall's money.

According to James's testimony, after Mrs. Hall returned to Texas to resume living at Rolling Meadows, the defendant asked James to come to Oklahoma City to "discuss some money." When James met with the defendant in Oklahoma City, the defendant told James that "he had got all of my grandmother's money and that she took me out of the will and only willed me $10." The defendant then, according to James, made James a "business proposition": the defendant would buy James a truck and a house or James could be the defendant's business partner. James also testified that the defendant stated that he would take the money and go to Australia if James "rock[ed] the boat." A few days later, James returned to the defendant's house and together they went to Jackie Cooper Olds/GMC, where the defendant purchased the pickup. James admitted at trial that, prior to the purchase of the pickup, he knew the defendant already had Mrs. Hall's money.

Taking all of the above evidence into consideration, we find sufficient evidence of a design "to conceal or disguise the

---

**2.** Lovett concedes that he did not conspicuously utilize the pickup truck, as the pickup was purchased for his brother James Lovett.

nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," as required by the money laundering statute. 18 U.S.C. § 1956(a)(1)(B)(i). There is ample evidence that the defendant's purchase of the pickup was designed, at least in part, to conceal or disguise the location or source of the proceeds of his fraudulent activity.

■ The defendant contends that, according to our holding in *Sanders*, evidence is not sufficient because he participated personally in the transaction. In *Sanders* we noted that, according to the legislative history, Congress intended that the money laundering statute *"include* transactions designed to conceal the identity of the participants to the transaction." *Sanders*, 929 F.2d at 1472 n. 2 (quoting Senate Report No. 99–433) (emphasis added). We find no requirement in the statute or in *Sanders* that every money laundering conviction must be supported by evidence of intent to conceal the identity of the participants to the transaction.[3] Even though the defendant made no efforts to conceal his identity from the salesman at the Jackie Cooper Olds/GMC dealership, the evidence sufficiently supports the inference that a concealment occurred in another sense. The purchase of the pickup truck was designed to conceal the illegal source of the proceeds from those who would likely expose the defendant's underlying fraudulent activities—Mrs. Hall, an attorney or an accountant. By purchasing the pickup, the defendant both disguised the nature of the cash proceeds he took from his grandmother and also prevented discovery of the fraudulent activities that generated the funds ultimately used to purchase the pickup.

### B. The House

■ In May or June of 1990, the defendant and his wife contacted Kathleen Jones of Flair Agency Realtors to assist them in their search for a new house. Jones testified that the Lovetts considered more than 150 properties before they submitted a contract on the house they eventually purchased. Prior to the closing on August 14th, 1990, the defendant personally visited the house at least three times in the presence of Jones or Ruth Carrigan, the listing agent. Both the defendant and his wife were present at the closing. After the closing, the Lovetts moved into the house and used it as their residence.

The trial transcript reveals that the defendant, on several occasions, provided third parties with conflicting explanations concerning the funds he used to purchase his house. The defendant and his wife informed Jones that there would be no mortgage involved in the purchase of the house and that the money to purchase the house would come from a certificate of deposit. Jones testified that the Lovetts told her that their grandmother, Mrs. Hall, was "participating with them in the purchase" of the house. The defendant, however, told his sister, Sharon Lynn Barton, that he purchased the house with cash generated from "a real big deal in San Antonio," which Barton assumed to mean a

---

**3.** This interpretation is not inconsistent with our statement in *Sanders* that "the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the relationship of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." In *Sanders,* where the facts contained no hint of the defendant's intent to conceal or disguise in any respect, we had no occasion to address whether a money laundering conviction *must* be supported by evidence of, perhaps, the most obvious type of concealment—that of employing a third party in order to conceal the defendant's identity from others. To find that the money laundering statute is aimed solely at those transactions designed to conceal the identity of the participants to the transaction is to ignore the broad language of the statute.

We see no reason why the concealment requirement may not be met by other affirmative acts related to the commercial transaction—acts designed to quell the suspicions of third parties regarding the nature, location, source, ownership or control of the proceeds of the defendant's unlawful activity. In short, the money laundering statute is not aimed solely at commercial transactions intended to disguise the relationship of the item purchased with the person providing the proceeds; the statute is aimed broadly at *transactions designed in whole or in part* to conceal or disguise *in any manner* the nature, location, source, ownership or control of the proceeds of unlawful activity.

home improvement deal related to the defendant's business. Barton testified that the defendant never mentioned Mrs. Hall in relation to their discussion about the purchase of the house.

At the closing, the defendant tendered five cashier's checks totalling $118,719.75 from five banks as full payment for the house. The evidence reveals that the five certified checks were the product of an elaborate series of banking transactions which the defendant undertook in the course of transferring virtually all of Mrs. Hall's money from her various accounts in Texas to the defendant's accounts in Oklahoma.

The government produced evidence of conflicting explanations the defendant gave to bank employees in the course of these transfers. In May of 1990, when the defendant closed two of Mrs. Hall's accounts at First Federal Savings & Loan in Wichita Falls, Texas, he told Karen Worley, an employee of that bank, that he was taking the money out of the accounts to invest in "some mortgage securities." When pressed by Worley for an explanation of whether this was a wise move given the economy, the defendant replied that Mrs. Hall needed a shelter for her taxes. The defendant then deposited the proceeds from Mrs. Hall's Wichita Falls First Federal Savings & Loan Accounts into two of the defendant's accounts in Oklahoma—account # 06–0612672–3 at the Local Federal Savings & Loan and account # 708–738–1 at Union Bank.

On June 6th or 7th, 1990, the defendant used $100,000 from his Local Federal Savings & Loan account, and $80,000 from his Union Bank Account to purchase a $180,-000 certificate of deposit at Heartland Federal Savings & Loan. Jan Hilburn, an employee of Heartland Federal, testified that the defendant told her that $100,000 came from the sale of a house, that he was in the process of building another house, and that he wanted to invest the $100,000 "until that time." On August 3, 1990, the defendant returned to Heartland Federal to request a loan in the amount of $150,000. He offered his $180,000 certificate of deposit as collateral. The bank approved the loan with the certificate of deposit as collateral and disbursed the money in six checks, payable to Mr. Lovett, in the amount of $25,000 each. The defendant deposited the six checks into five accounts at five different banks in Oklahoma.

One of the banks, Community Bank, placed a hold on the defendant's account because "the personnel that opened the account were a little bit shaky about the way he had opened the account." Judy Montgomery, an employee of Community Bank, testified that the bank became cautious because there were indications that Mr. Lovett was engaging in similar transactions at other banks. Because of the hold, the defendant went to see Montgomery. According to Montgomery's testimony, the defendant explained that he was trying to "diversify his funds" and that he was going to "come into a lot of money." Montgomery informed the defendant that banks get very cautious when somebody goes "around opening accounts at all different banks." The defendant responded that "he wasn't a crook."

Viewing the above evidence in the light most favorable to the government, we conclude that there is sufficient evidence that the defendant, when he purchased the house, intended to disguise the nature or source of the proceeds he fraudulently obtained from Mrs. Hall. A reasonable jury could have found that the defendant made the numerous conflicting statements regarding the source of the proceeds precisely to disguise that he had obtained the funds through fraud and to quell the suspicions of the bank employees regarding his activities. The financial transactions outlined above were closely related to the purchase of the house. Of the $118,719.75 the defendant used to purchase the house, more than $88,000 represented proceeds of the $150,000 loan the defendant obtained from Heartland Federal Savings & Loan on August 3, 1990—a loan secured by a certificate of deposit that the defendant purchased with funds that he misrepresented as proceeds from the sale of a house. Four of the five checks the defendant tendered at the house closing were drawn on ac-

counts into which the defendant had deposited one or more of the $25,000 checks he received as proceeds from the Heartland Federal loan. The fifth check the defendant tendered at the closing was drawn on his account at Union Bank—the same account into which the defendant deposited funds he had withdrawn from Mrs. Hall's various accounts at First Federal Savings & Loan in Texas. Clearly, the purchase of the house was directly facilitated by the defendant's convoluted series of financial transactions, combined with his numerous misleading statements regarding the nature and source of the proceeds. We conclude that from these circumstances a jury could reasonably infer that—by purchasing the house—the defendant simply intended to further conceal the proceeds of his fraudulent activities. *See United States v. Beddow*, 957 F.2d 1330, 1335 (6th Cir.1992) (evidence of a defendant's "convoluted financial dealing" with his banks and in his business "support a conclusion that he intended to disguise the illegal source of his money"). Thus, we affirm the defendant's conviction on Count 29.

### C. The Suburban

■ On July 16, 1990, the defendant, his wife and his three children test drove a GMC Suburban at Jackie Cooper Olds/GMC. Three days later the defendant returned to the car dealership to purchase a Suburban. He tendered a personal check for the purchase price of $22,251 and then substituted a cashier's check when the business manager required certified funds before marking the contract "paid in full." The defendant titled the Suburban in his wife's name. The Lovetts used the Suburban as their family car after the purchase.

The government argues that this purchase can be distinguished from the purchase of the cars in the *Sanders* case because Lovett "created the impression with the salesman that his siding business was a lucrative business, going so far as to offer the salesman a job." At trial, the car salesman testified that on July 16th, the defendant "talked about that he had a siding business and that he had done pretty well in it, I guess. Actually that day we

didn't really elaborate too much on the siding business." The salesman further testified that on July 19th, the day of the purchase, the defendant

> was talking about how he had done really well in the siding business. He was fixing to leave to go on a fishing expedition with some friends or something like that. He even offered me a job at one point telling me he thought I would do really well in it. Obviously I didn't take it. But we talked—we talked a little bit, a lot more that day about the siding business than we did the first day.

We disagree with the government that these statements alone show that Lovett was attempting to conceal the origin or nature of the proceeds of his unlawful activity by attributing the funds to a legitimate business. There is no indication that Lovett made statements in an effort to justify or explain his ability to purchase the Suburban with cash. These statements are insufficient evidence that the defendant acted with the intent to conceal or disguise the nature or source of the proceeds of his fraudulent activity. In the absence of any evidence of concealment, the defendant's open and conspicuous manner of purchasing the Suburban undermines any inference of concealment or disguise. *Sanders*, 929 F.2d at 1472–73. Furthermore, "merely spending the proceeds of illegal activities does not violate the money laundering statute." *United States v. Edgmon*, 952 F.2d 1206, 1210 (10th Cir.1991) (citing *Sanders*, 929 F.2d at 1472). Therefore, we reverse Lovett's conviction on Count 27. In addition, we reverse Lovett's conviction on Count 32—the forfeiture count based on his conviction on Count 27. We also vacate the district court's order for the defendant to pay a $50 mandatory special assessment for Count 27 and for Count 32.

### D. The Ring

■ On June 4, 1990, Lovett went to Lewis Jewelers and selected a diamond ring for himself. Mr. Lewis, the co-owner of Lewis Jewelers, testified that the defendant called the store on two or three occasions to inquire whether the ring was

ready. The defendant returned to the store on June 20th to pay for the ring with a personal check in the amount of $6,300. He gave the check to Susie Smith, an employee of Lewis Jewelers. Lewis testified that the defendant did not make the check payable to Lewis Jewelers, but to Lewis personally, "which is kind of unusual." Also, Lewis testified that the check fell $56 short of covering the full purchase price of $6,356. Mrs. Lovett picked up the ring the day after Lovett tendered the check. The store notified the Lovetts of the $56 shortfall and Mrs. Lovett returned to the store two or three days after she picked up the ring to pay the $56. At trial, Lewis and Smith readily identified both the defendant and his wife.

In support of its argument that there is sufficient evidence of concealment, the government draws our attention to the unusual nature of payment. The government notes, in particular, that the defendant made the check out to Mr. Lewis instead of to Lewis Jewelers. We presume that the government intended that the jury infer from this evidence that the defendant handled the transaction in an underhanded fashion. Although the nature of the payment may have been unusual, we conclude that such evidence alone does not support an inference that the defendant acted with the intent to conceal or disguise the nature or source of the proceeds of his fraudulent activity. As with the purchase of the Suburban, the defendant's open and conspicuous manner in purchasing the ring undermines any inference that the defendant acted with the intent to conceal. *Sanders*, 929 F.2d at 1472–73. Although Lovett used the proceeds of his illegal activities to purchase the ring, the government presented no evidence that the purchase of the ring was designed to conceal or disguise in any manner "the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," as required by the money laundering statute. 18 U.S.C. § 1956(a)(1)(B)(i). Therefore, we

reverse Lovett's conviction on Count 30. In addition, we reverse Lovett's conviction on Count 35—the forfeiture count based on his conviction on Count 30. We also vacate the district court's order for the defendant to pay a $50 mandatory special assessment for Count 30 and for Count 35.

### III.

■ The defendant argues that the evidence of exchange is insufficient to support his conviction on Counts 21–26, which allege that the defendant knowingly engaged in monetary transactions in property derived from unlawful activity in violation of 18 U.S.C. § 1957(a).[4] Counts 21–26 relate to Lovett's deposit of proceeds of the $150,000 loan he obtained from Heartland Federal using his $180,000 certificate of deposit as collateral. Lovett received the loan proceeds in six checks, each for $25,000, which he deposited into five accounts at five different banks in Oklahoma City.

The defendant argues that the conduct charged in Counts 21–26—each alleging that he withdrew $25,000 from Heartland Federal and deposited it into another bank—does not fall within the definition of "monetary transaction" as that term is defined in § 1957. Section 1957(f)(1) defines monetary transaction as

> the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution ..., but such term does not include any transaction necessary to preserve a person's right to representation as guaranteed by the sixth amendment to the Constitution.

Lovett asserts that the government must prove that the $150,000 loan was an "exchange" for cash proceeds that he used to purchase the $180,000 certificate of deposit. Lovett's theory is that the government must establish that the loan was an "exchange" because "the initial purchase of

---

4. In pertinent part, 18 U.S.C. § 1957(a) provides:

Whoever ... knowingly engages or attempts to engage in a monetary transaction in crimi-

nally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

the certificate of deposit (or arguably the 'transfer' or 'deposit' of Mrs. Hall's money) was already charged in Counts 17 and 18." At issue, however, is not whether the loan constitutes an "exchange" for the certificate of deposit, but rather whether the act of depositing the loan proceeds into another financial institution constitutes a monetary transaction. Clearly, under the language of § 1957(f)(1), a deposit falls within the scope of a monetary transaction. We see no basis for requiring the government to prove that each deposit was an "exchange" of some sort when the conduct alleged in Counts 21–26 relates to the deposits and not to the loan itself.

## IV.

■ Next, Lovett contends that the government failed to present sufficient evidence that the transfers of funds alleged in Counts 13, 17, 18 and 21–26 were transactions "in or affecting interstate or foreign commerce," as required for a conviction under 18 U.S.C. § 1957(a). In a series of transactions, Lovett transferred most of Mrs. Hall's money from her Texas bank accounts into two banks in Oklahoma. Then, in a second series of transactions, these funds were transferred out of the two Oklahoma banks and deposited into other banks, also in Oklahoma. Counts 13, 17, 18 and 21–26 involve the second series of transactions. Lovett argues that there is no evidence that the transfers alleged in these counts were part of, or might affect, interstate commerce. The government points out that Lovett purchased items in interstate commerce with funds traceable to the transfers alleged in each of the counts at issue. Thus, the government maintains that there is sufficient evidence that the transfers were "in or involving interstate commerce" because each of the transfers, at some point, had an effect on interstate commerce.

We recently held that the requirement of § 1957 "that the transaction be 'in or affecting interstate commerce' must be met in order to confer jurisdiction on federal courts. Such, however, is not an essential element of the crime charged." *United States v. Kelley*, 929 F.2d 582, 586 (10th

Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991). In *Kelley* we noted that a "minimal effect" on interstate commerce is sufficient to confer federal jurisdiction in statutes analogous to § 1957. *Id.* We implied that a "minimal effect" should, likewise, be sufficient to establish federal jurisdiction under § 1957. *See id.*

The factual basis for the § 1957(a) conviction in *Kelley* was the purchase of an automobile. According to the evidence, the car which the defendant bought at a local car agency had been manufactured in another state; the car agency engaged in interstate commerce; and the money the defendant paid for the car would be used by the car agency to purchase cars and parts from other states. We concluded that evidence was sufficient to confer federal jurisdiction. *Id.*

Turning to the facts of this case, Count 13 charges the defendant with transferring $30,000 from Union Bank to First Interstate Bank. The defendant used monies from his First Interstate account to purchase a ring and a GMC Suburban vehicle. The owner of the Oklahoma City jewelry shop testified that the gold for the ring was purchased in Indiana and the diamonds were shipped from New York. With respect to the Suburban, the business manager of Jackie Cooper Olds/GMC testified that the Suburban was not manufactured in Oklahoma. He also explained that the cars at the dealership were handled under a floor plan, whereby the dealership pays interest to GMAC corporate headquarters in Michigan. When the dealership sells a car, it pays off the car by sending a check to GMAC in Michigan.

The remaining counts—Counts 17, 18, 21–26—all relate to the financial transactions that preceded Lovett's purchase of his house. As discussed above in section II, Lovett transferred large sums of Mrs. Hall's money into Local Federal Savings & Loan and into Union Bank. Counts 17 and 18 relate to his transfers of $100,000 out of Local Federal and $80,000 out of Union Bank to purchase a $180,000 certificate of deposit at Heartland Federal. Lovett ob-

tained a $150,000 loan from Heartland Federal, using the certificate of deposit as collateral. The loan was disbursed in six checks, each for the amount of $25,000. Counts 21–26 relate to Lovett's deposit of the six checks. Lovett purchased a house for $118,000 in cash. The record reveals that more than $88,000 of the money he tendered in payment for the house represented proceeds of the loan that Lovett obtained from Heartland Federal. A relocation company based in New Jersey handled the sale of the house. All documents related to the sale were sent to the relocation company in New Jersey for approval. At closing, the funds were wired to New Jersey.

We conclude that the evidence is sufficient on Counts 13, 17, 18, and 21–26 to confer federal jurisdiction. The record reveals that each transaction charged in those counts had at least a minimal effect on interstate commerce.

## V.

■ Lovett also challenges his conviction on Counts 11–15, 17–20, and 21–26 on grounds that the district court failed to define the terms "monetary transaction" and "financial institution" in the jury instructions. Each of these counts alleges that the defendant engaged in a monetary transaction in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957(a). Section 1957(a) requires evidence that the defendant engaged in a monetary transaction. Lovett contends that the term "monetary transaction" and the term "financial institution"—which is part of the definition of a monetary transaction, *see* § 1957(f)(1)—are legally significant terms that should have been defined for the jury. Furthermore, Lovett argues that the instructions should have defined these terms because the jury might have been confused and misled by the definition of "financial transaction" given in relation to Counts 27–30, which charged a violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Lovett's proposed jury instructions contained the definition of "monetary transaction," but not the definition of "financial institution." The record reflects that Lovett failed to object to the district court's omission of the definition of either term from the final jury instructions. Therefore, we review only for plain error. *See* Fed.R.Crim.P. 30; Fed.R.Crim.P. 52(b); *United States v. Simmonds*, 931 F.2d 685, 687 (10th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 129, 116 L.Ed.2d 97 (1991). A "[p]lain error is *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done.'" *United States v. Henning*, 906 F.2d 1392, 1397 (10th Cir.1990) (quoting *United States v. Coppola*, 486 F.2d 882, 884 (10th Cir.1973), *cert. denied*, 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974)) (citation omitted), *cert. denied*, —— U.S. ——, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991).

Viewing Lovett's claim against the entire record, we are not convinced that the giving of a "financial institution" instruction "would have had such an impact upon the jury that it would have reached a contrary result." *See Henning*, 906 F.2d at 1398. Therefore, we find that the court's failure to give a "financial institution" instruction does not rise to the level of plain error.

Likewise, after reviewing the entire record, we cannot conclude the jury would have reached a contrary result had a "monetary transaction" instruction been given. The instruction defining "financial transaction" clearly related to the § 1956 counts and there is no evidence that the jury was misled or confused as to whether the "financial transaction" instruction should apply to Counts 11–15 and 16–26. In light of the overwhelming evidence that the defendant's conduct amounted to a monetary transaction, we conclude that the district court's failure to give a "monetary transaction" instruction does not amount to plain error.

## VI.

■ Lovett contends that the evidence of fraud was insufficient to support his convictions on Counts 2–10, which allege the interstate transportation of fraudulently obtained funds in violation of 18 U.S.C. § 2314. Specifically, Counts 2–10 charge

Lovett with transporting Mrs. Hall's money from Texas to Oklahoma, "knowing the funds to have been taken by fraud." Clearly, Mrs. Hall wanted most of her assets to pass to Lovett: she gave him $10,000 on one occasion and $50,000 on another, and she also executed a will leaving most of her estate to the defendant upon her death. There is sufficient evidence, however, to conclude that Lovett engaged in fraud to prematurely obtain his grandmother's money.

It is undisputed that the defendant transferred nearly all of his grandmother's money from her accounts in Texas to his accounts in Oklahoma. Lovett alleges that the evidence shows that he obtained the funds (1) from accounts on which he was a co-owner, or (2) through withdrawal requests on behalf of his grandmother, and signed by his grandmother, which directed that the funds to be released to Lovett. But the jury also heard testimony that Mrs. Hall was in poor health during the period the funds were transferred. Mrs. Hall testified that in March and April of 1990 she was "near death." She also testified that after her surgery, when she was staying with the Lovetts in Oklahoma, she was on pain medication.

According to Mrs. Hall, the defendant obtained her signature on several things by telling her "it was one thing and it would be something else." Mrs. Hall did not recall signing any documents knowing that the documents directed her accounts to be closed and the money to be released to Lovett. Although Mrs. Hall agreed that Lovett would handle her bills while she was ill, she and Lovett were to discuss those matters and she was to "sign it" herself.

Prior to Mrs. Hall's return to Texas, Lovett told her that she did not have any money. Despite the defendant's representations that he was investing his grandmother's money for her, trying to earn higher interest, and placing the money in tax shelters, the evidence shows that none of the accounts were set up with Mrs. Hall as the owner, or even the co-owner; instead, the accounts listed the defendant and his wife as the owners. The Texas banks imposed substantial early withdrawal penalties when Lovett closed Mrs. Hall's certificate of deposit accounts. Of the $316,000 dollars taken from Mrs. Hall's accounts, Lovett spent approximately $176,000 to purchase property, including a house, a ring, and two automobiles, and other cash transactions. Lovett spent only $5,100 on Mrs. Hall's behalf, to pay for her medical expenses.

Evidence at trial indicates that Lovett applied a significant amount of his grandmother's money toward the purchase of his house. Lovett argues that Mrs. Hall agreed to participate in the purchase of the house. Mrs. Hall testified that she discussed the prospect of buying a house with Lovett, but backed out when she learned that Lovett wanted the house to be titled only in his name.

When Mrs. Hall returned to Texas and discovered that she had less than $3000 left in her accounts, she telephoned the defendant several times in an attempt to get the money back. During one of these conversations, Lovett provided Mrs. Hall with a false address of the house he purchased. He also told her he wanted to "do the right thing," that he was going to give the money back and put the money in her name. During one conversation, he stated, "I'm gonna spend every dime of it . . . I'm gonna blow it." In other conversations, Lovett told Mrs. Hall that he had deposited the money into an account in New England and had put part of the money in his father's name. The government found no evidence of such accounts, however.

Viewing all of the evidence in the light most favorable to the government, we find sufficient evidence of fraud for a reasonable jury to find the defendant guilty beyond a reasonable doubt.

## VII.

Lovett also attacks his convictions on Counts 2–10 on the grounds that he should have been convicted of only five counts, rather than nine, because the appropriate unit of prosecution for a violation of 18 U.S.C. § 2314 is the number of transportations across state lines, not the num-

ber of financial transactions with each financial institution. The government concedes that the transportation of funds charged in Count 3 should be included within the same "transportation" charged in Count 2; that the transportation in Counts 5 and 6 should be included with Count 4; and that the transportation charged in Count 10 should be included with Count 9. We agree. *See Castle v. United States,* 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75 (1961) (applying the principles of *Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) to the unit of prosecution for violations of 18 U.S.C. § 2314). Therefore, we vacate the convictions on Counts 3, 5, 6 and 10. *See United States v. Nall,* 949 F.2d 301, 308 (10th Cir.1991) (vacating all but one count where government charged in separate counts actions that fell within the same unit of prosecution under 31 U.S.C. § 5324(3)) (citing *United States v. Dashney,* 937 F.2d 532, 542 (10th Cir. 1991)). We also vacate the district court's order that the defendant pay a $50 mandatory special assessment on Counts 3, 5, 6 and 10.

## VIII.

Lovett also argues that the district court violated his rights against double jeopardy by imposing separate judgments and convictions for the § 2314 counts and for the § 1957 counts. For each § 2314 count alleging that Lovett transported fraudulently obtained funds from Texas to Oklahoma, there is a related § 1957 count alleging that Lovett engaged in a monetary transaction by depositing these fraudulently obtained funds in an Oklahoma financial institution. Lovett argues that each transport of funds from Texas to Oklahoma and corresponding deposit of those funds into an Oklahoma financial institution constitutes a single course of conduct and that his convictions under both § 2314 and § 1957 constitute convictions for the same offense under the test announced in *Blockburger v. United States,* 284 U.S. 299, 52

S.Ct. 180, 76 L.Ed. 306 (1932).[5] Lovett urges this court to vacate his convictions under § 2314 on grounds that § 2314 is a lesser included offense of § 1957 and not a distinct offense from § 1957 under *Blockburger.*

■ The Double Jeopardy Clause protects against multiple punishments for the same offense. *See Grady v. Corbin,* 495 U.S. 508, 516, 110 S.Ct. 2084, 2090–91, 109 L.Ed.2d 548 (1990). Within the contours of a single prosecution, where a defendant's conviction on multiple counts stems from the same criminal behavior, "our review is limited to whether Congress intended multiple convictions and sentences under the statutes." *United States v. Morehead,* 959 F.2d 1489, 1506 (10th Cir.1992) (citing *Garrett v. United States,* 471 U.S. 773, 779, 105 S.Ct. 2407, 2411–12, 85 L.Ed.2d 764 (1985) and *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983)); *but cf Edgmon,* 952 F.2d at 1213–14 (undertaking the additional determination of whether prosecution for both offenses in a single prosecution violates the Double Jeopardy Clause). We discern the intent of Congress by looking at the language of the statute and then to legislative history. *Id.*

■ Section 1957, which was passed as part of the Money Laundering Control Act of 1986, Pub.L. No. 99–570, § 1352, 100 Stat. 3207, prohibits monetary transactions involving criminally derived property. The essential elements of a § 1957 violation are that (1) the defendant engage or attempt to engage (2) in a monetary transaction (3) in criminally derived property (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from "specified unlawful activity." 18 U.S.C. § 1957(a). The crimes comprising "specified unlawful activity" are listed in 18 U.S.C. § 1956(c)(7). 18 U.S.C. § 1957(f)(3).

We agree with Lovett that the elements of the particular "specified unlawful activi-

---

**5.** Under *Blockburger*
[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine

whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.
*Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182.

ty"—a violation of 18 U.S.C. § 2314 in this case—are essential elements that the prosecution must prove in order to establish a violation of § 1957.[6] Thus, we cannot conclude that each of these two statutory "provision[s] requires proof of a fact that the other does not." The *Blockburger* test thus gives rise to the presumption that Congress did not intend to impose punishment for two separate offenses in this case. Contrary to Lovett's assertion, however, the *Blockburger* test is not necessarily decisive of his double jeopardy challenge. *Edgmon,* 952 F.2d at 1213. The *Blockburger* test is a " 'rule of statutory construction' " that we employ to " 'determine whether Congress has in a given situation provided that two statutory offenses may be punished cumulatively.' " *Morehead,* 959 F.2d at 1506 (citing *Whalen v. United States,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980) and *Albernaz v. United States,* 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981)) (further citation omitted). "Insofar as the question is one of legislative intent, the *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress." *Garrett,* 471 U.S. at 779, 105 S.Ct. at 2412.

The statutory language and legislative history of the monetary transaction statute lead us to conclude that Congress intended § 1957 to be a separate criminal offense which is punishable in addition to the underlying "specified unlawful activity." Section 1957 clearly requires that the property involved in the monetary transaction must derive from specified unlawful activity. Yet, nothing about the language of § 1957 suggests that a § 1957 conviction should be imposed only in lieu of a conviction for the underlying specified unlawful activity. The legislative history[7] indicates

that the Money Laundering Control Act of 1986 created two *new* federal offenses— § 1957, the monetary transactions statute and § 1956, the money laundering statute—that are designed to criminalize "the *post-crime hiding* of illgotten gains." *See Edgmon,* 952 F.2d at 1213 (emphasis added) (discussing whether Congress intended § 1956 to be a separate crime distinct from the underlying specified unlawful activity that generated the money to be laundered); *see also* S.Rep. No. 433, 99th Cong., 2d Sess., 1–9 (1986). We recently stated in *Edgmon* that "Congress aimed the crime of money laundering [§ 1956] at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.' " *Edgmon,* 952 F.2d at 1214 (construing the legislative history of § 1956). Likewise, our review of the legislative history convinces us that through the monetary transaction statute, § 1957, Congress intended to separately punish a defendant for monetary transactions that follow in time the underlying specified unlawful activity that generated the criminally derived property in the first place. H.R.Rep. No. 855, 99th Cong., 2d Sess., pt. 1, at 7 (1986) (the purpose of the legislation is to create "a new Federal crime of money laundering which will punish transactions that are undertaken with the proceeds of crimes or are designed to launder the proceeds of crime"). " 'There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction.*' " *Garrett,* 471 U.S. at 779, 105 S.Ct. at 2411–12 (quoting *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182) (emphasis added in *Garrett* ). We conclude that Congress intended to impose separate punishments for a violation of

---

**6.** Under § 1956(c)(7)(a), the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title." Under 18 U.S.C. § 1961(1), a violation of 18 U.S.C. § 2314 is specifically listed as a predicate offense. Therefore, we agree with the district court's conclusion that § 2314 is a "specified unlawful activity" within the meaning of § 1957.

**7.** Congress did not submit a Senate or House Report along with the Anti–Drug Abuse Act of 1986, the legislation which contained the Money Laundering Control Act of 1986. 1986 U.S.Code Cong. & Admin.News 5393. Two related reports, however, provide some guidance as to the scope and purpose of the Money Laundering Control Act. *See* S.Rep. No. 433, 99th Cong., 2d Sess. (1986); H.R.Rep. No. 855, 99th Cong., 2d Sess., pt. 1 (1986).

§ 1957 and a corresponding violation of § 2314—the underlying specified unlawful activity.

## IX.

Finally, Lovett contends that the district court erroneously ordered him to pay a $50 mandatory special assessment on each of Counts 31–35, the forfeiture counts. Lovett argues that because he could not have been imprisoned for the forfeiture convictions, *see* 18 U.S.C. § 982, he should not have been ordered to pay the $50 special assessments, which apply only to felonies, *see* 18 U.S.C. § 3013. The government concedes this point and we agree. We already have reversed Lovett's convictions on Counts 32 and 35 and have vacated the special assessments related to those counts. We also vacate the district court's imposition of the $50 mandatory special assessments on Counts 31, 33 and 34.

We REVERSE the convictions on Counts 27, 30, 32, and 35; we VACATE the convictions on Counts 3, 5, 6 and 10; we VACATE the district court's orders for special assessments on Counts 3, 5, 6, 10, 27, 30, 31, 32, 33, 34 and 35; and we REMAND for resentencing. The judgment of the district court is AFFIRMED in all other respects.