**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Pamela Sue HOLLIS, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William T. "Tom" HOLLIS, Defendant–Appellant.**

Nos. 91–6290, 91–6291.

United States Court of Appeals, Tenth Circuit.

July 31, 1992.

**1444**

Mac Oyler, Oklahoma City, Okl., for defendant-appellant, Pamela Sue Hollis.

Mack K. Martin (Laurel S. Smith with him on the briefs), Martin Law Office, Oklahoma City, Okl., for defendant-appellant, William T. "Tom" Hollis.

Robert G. McCampbell, Asst. U.S. Atty. (Timothy D. Leonard, U.S. Atty., with him on the briefs), Oklahoma City, Okl., for plaintiff-appellee.

* The Honorable Joseph T. Sneed, Senior Circuit Judge, U.S. Court of Appeals for the Ninth Circuit, sitting by designation.

1. Tom Hollis was charged with two additional counts of engaging in monetary transactions in interstate commerce in criminally derived proceeds, in violation of 18 U.S.C. § 1957(a). He was convicted on one count and acquitted of the other.

Before ANDERSON, McWILLIAMS, and SNEED,* Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

William "Tom" Hollis and Pamela Sue Hollis were convicted after a jury trial for two counts of bank fraud, in violation of 18 U.S.C. § 1344; one count of submitting false financial statements to a financial institution, in violation of 18 U.S.C. § 1014; two counts of mail fraud, in violation of 18 U.S.C. § 1341; and three counts of engaging in a monetary transaction in interstate commerce in criminally derived proceeds, in violation of 18 U.S.C. § 1957(a).[1]

Both appeal their convictions on the grounds that: (1) insufficient evidence was established to support the mail fraud counts alleged in Counts 4 and 8, (2) the government violated their rights against double jeopardy by imposing multiple convictions and sentences for the offenses alleged in Counts 1–3, 4–7, and 8–10; (3) the court improperly instructed the jury (a) by giving an instruction that the Hollises were presumed to know what the law forbids, which according to the Hollises eliminated the government's burden of proving that they "willfully" violated the law, and (b) by failing to give the Hollises' proposed instruction that repayment of the loans might negate the specific intent required to establish bank fraud; (4) the government's rebuttal argument (a) denied the Hollises a fair trial when the prosecutor commented on their reasons for exercising their right to a jury trial, and (b) misstated the law as to the legal effect of the transfer of their office building property; and (5) the trial court erred in providing a supplemental jury instruction *ex parte* during the jury deliberations.[2] In addition, Tom Hollis ar-

2. Pursuant to Fed.R.App.P. 28(i), Tom Hollis has adopted the arguments made by Pamela Hollis in her opening and reply briefs. *See* Appellant's Br. at 1; Appellant's Reply Br. at 1. Therefore, as a convention, we have referred to some arguments as having been made by "the Hollises," even though they were articulated solely by Pamela Hollis for reasons that may have uniquely concerned her.

gues: (1) that the district court erred in not severing Counts 1–3, 4–7, and 8–10 under Fed.R.Crim.P. 14, and (2) that his Fifth Amendment rights were violated when sworn testimony that he was previously compelled to give was admitted at trial. Finally, the Hollises attack their sentences as exceeding the maximum amount that may be imposed under the Sentencing Guidelines.

While these appeals have not been formally consolidated, for reasons of efficiency, we have companioned them for purposes of disposition. We now affirm the convictions and sentences, with the exception of the fines imposed under the Sentencing Guidelines, which we discuss below.

## I. FACTS

The Hollises were charged under a ten count indictment. Tom Hollis was named in Counts 1–10, and Pamela Hollis was named in Counts 1–8. The indictment describes three distinct criminal episodes. Counts 1–3 concern loans that the Hollises obtained to finance the purchase of an office building. Counts 4–7 concern an insurance claim that the Hollises filed after claiming that their house had been burglarized. Counts 8–10 concern an insurance claim that the Hollises submitted after their office building had been struck by lightning. The government claims in each case that the loan or insurance proceeds were obtained by fraud through the submission of false documents.

### A. *Bank Fraud (Counts 1–3).*

Counts 1 and 2 allege that the Hollises knowingly executed a scheme to obtain loans from First Interstate Bank in Oklahoma city ("First Interstate") and the Metro Area Development Corporation ("MADC") by false and fraudulent pretenses and representations in violation of 18 U.S.C. §§ 1344 and 2.

In April of 1988, the Hollises obtained a loan for $240,000 from First Interstate and a loan for $147,000 from MADC to finance the purchase of an office building located in Oklahoma City. The loans were ob-

tained pursuant to a government guaranteed lending program at First Interstate, under which a small business could obtain a 10–year loan from First Interstate and a 20–year second mortgage loan from MADC. During the loan approval process, Melinda Fritze, the manager of the First Interstate program, required the Hollises to submit three years' tax returns, financial statements, and personal financial statements. After receipt and review of that information, First Interstate approved the loan and then turned over its credit analysis and the statements to MADC, which after independently analyzing the financial information, approved its loan.

The tax returns that the Hollises submitted to First Interstate for 1984, 1985, and 1986 showed an adjusted gross income for each year ranging from $103,072 to $151,456. The tax returns were not represented to be estimates. In fact, the 1984 and 1985 returns had already been filed with the I.R.S. Melinda Fritze required the Hollises to sign the returns to verify that they were accurate. None of the three returns accurately reflected the Hollises' adjusted gross income. The actual tax returns submitted to the I.R.S. for the same years (1984–1986) showed a loss ranging from $75,809 to $159,068.

In spite of this, the payments on both loans had been kept current. At the time of trial, $72,000 of First Interstate's principal had been paid, leaving a balance of $168,000. The MADC loan had been paid down to $138,000 from $147,000. Further, at the time of the office building purchase, the Hollises contributed $92,000 or 20% toward the purchase. The collateral securing the loans had not deteriorated from the time the loans were made until the time of trial.

On October 1, 1988, after the loans were obtained, the Hollises submitted a financial statement to First Interstate as required by their loan agreement. The statement misrepresented the ownership of the office building, which the Hollises had deeded to Pamela Hollis, Clarence Brown and Ruby Brown; stated that the Hollises had $270,-000 on deposit in banks, when in fact they

had less than $100,000; reported that the Hollises had $25,000 on deposit in an account that did not exist; overstated the Hollises 1987 income; listed two pieces of real estate that the Hollises claimed to own but did not in fact own; and stated their credit card debt as $5,000, when in fact it was over $30,000.

The transfer of ownership of the office building was a specific breach of the lending agreement, which if disclosed, would have allowed First Interstate to pursue various legal remedies, such as foreclosure. Disclosure of the other facts may have led First Interstate to demand further collateral or monitor the loan more vigilantly.

Count 3 alleges that these material false representations were made for the purpose of influencing the action of First Interstate upon the loan in violation of 18 U.S.C. §§ 1014 and 2.

### B. *Home Burglary (Counts 4–7).*

Count 4 alleges that the Hollises devised a scheme to defraud Farmers Insurance Group of Companies ("Farmers") of money by filing a false insurance claim of $107,-859 for items claimed to have been stolen in a house burglary that were not in fact stolen, and that in execution of the scheme, the Hollises caused the mailing of a Sworn Statement in Proof of Loss ("Sworn Statement") form, in violation of 18 U.S.C. §§ 1341 and 2.

On December 3, 1988, the Hollises reported the burglary of their home to the Oklahoma City Police Department. Thereafter, the Hollises contacted Farmers, which had issued them a home owner's insurance policy that protected against loss from burglary. A Farmers representative met with the Hollises at their residence to inspect the scene, ascertain the facts and advise them of the policy coverage. The Hollises informed the representative that they had gone to Tulsa on business over the weekend and found that they had been burglarized when they returned.

The Farmers representative requested that Pamela find receipts for proof of purchase of the claimed stolen items and to cross-reference the receipts with a police report she was completing. Farmers was subsequently given receipts documenting the purchase of the stolen items. Farmers also received a completed Sworn Statement signed by the Hollises, which listed the items. Farmers had previously mailed the Sworn Statement form to the Hollises, and the policy required that the Sworn Statement be completed and submitted before the claim would be paid. The Farmers representative recommended that the claim be paid.

The evidence presented at trial, however, as viewed in the light most favorable to the government, demonstrated that the claim was fraudulent. First, in searches executed at the Hollises' home and at the home of Pamela Hollis' parents, the FBI found several items, including a diamond pendant, Bally Lifecycle, opossum jacket, mink jacket, Casio keyboard, and other electronic equipment, that the Hollises claimed were stolen, but that were not in fact stolen. Second, the Hollises presented purchase receipts of items allegedly stolen, such as a Browning rifle and stereo equipment, that they had purchased and later returned for a refund. Third, the Hollises used a forged receipt and a delivery receipt to document the purchase of electronic equipment and expensive leather garments that they had in fact never purchased.

The Hollises' housekeeper and nanny both testified that they had been told a burglary occurred and that they were shown evidence of the burglary. However, they testified that items they were told had been stolen began reappearing in the house several months after the alleged burglary. Tom Hollis in fact conceded in a taped conversation, "Sure, I doctored some receipts given to Farmers, but that don't make me a goddamned criminal." Tr. VII at 1583.

Having satisfied itself that the claims were valid, however, Farmers issued a check to repair the security system and then issued three separate checks of $10,-838, $42,155, and $33,450 toward payment of the claim. Counts 5, 6, and 7 allege that the Hollises knowingly engaged in a monetary transaction in interstate commerce in

criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. §§ 1957(a) and 2, when they endorsed and deposited the three insurance checks into an account controlled by them.

## C. The Lightning Strike.

Count 8 charges the Hollises with again violating 18 U.S.C. §§ 1341 and 2 in connection with another insurance claim filed with Farmers. The government alleged that the Hollises used false documents to overstate the amount of damage sustained by their office building as a result of a lightning strike. Farmers was notified of the claim when an employee of the Hollises' insurance agent mailed a property loss report to Farmers.

In order to pursue the claim, the Hollises authorized an employee named Jim Thomas to be their agent. It was Thomas who dealt primarily with the Farmers insurance adjustor and the repair and replacement vendors, although the Hollises were present and participated in a meeting with the adjustor, in which the claim was discussed.

In support of the claimed loss, Farmers received a back-dated contract for a security system that was not installed until after the lightning strike. The new security system was substantially better than that in place before the strike. Farmers also received two invoices for two telephone systems that allegedly replaced two earlier systems, when in fact a single system was replaced by another substantially better system. Further, Farmers received multiple invoices for repairs by Copy–Tek and Cowan Mechanical, two companies owned by James Cowan, a cousin of Jim Thomas. The invoices recited "William Henegar" as the Copy–Tek owner and listed the address and phone number of a Hollis employee not involved with Copy–Tek. Shelley Cowan, who kept the books of Cowan Mechanical at the time, claimed that there had been no jobs involving the amount claimed on the Cowan Mechanical invoices.

In payment of the claim, Farmers issued two checks—one in the amount of $19,-961.03 and the other in the amount of $22,-068.54. Both were endorsed by Tom Hollis and deposited at a financial institution, Quail Creek Bank. Counts 9 and 10 charge Tom Hollis with additional violations of 18 U.S.C. § 1957. He was acquitted on Count 9, apparently reflecting the jury's view that a substantial amount of the proceeds of the first check was legitimately derived.

## II. SUFFICIENCY OF EVIDENCE

For three reasons, the Hollises argue that there was insufficient evidence at trial to convict them under Counts 4 and 8 of the indictment. First, the Hollises argue that the prosecution failed to establish the use-of-mails element of the mail fraud offenses alleged in Counts 4 and 8. Second, they argue that one of the prosecution's two theories of a fraudulent scheme under Count 4 lacked sufficient evidence and that reversal of the conviction is therefore required, since it is impossible to determine on which theory the jury relied. Third, they argue that no evidence supports the finding that they participated in the fraudulent scheme alleged in Count 8.

In reviewing a sufficiency of evidence challenge, "the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## A. Use of Mails Element.

■ To satisfy the use-of-mails element of the mail fraud counts alleged in Counts 4 and 8, the government was required to prove two things. First, the government was required to prove that the mails were used "for the purpose of executing" the fraudulent scheme. 18 U.S.C. § 1341. " 'The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.' " *Schmuck v. United States,* 489 U.S. 705, 709–11, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989)

(quoting *Kann v. United States,* 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944)). To satisfy this requirement, "the use of the mails need not be an essential element of the scheme." *Id.* (citation omitted). "It is sufficient for the mailing to be 'incident to an essential part of the scheme,' or 'a step in [the] plot.'" *Id.* (citations omitted).

■ A rational jury could have found that mailings used to satisfy both counts of mail fraud were "incident to an essential part of the scheme." The mailing supplied to satisfy Count 4 was the mailing of the Sworn Statement to the Hollises. Evidence demonstrated both that the Hollises used the Sworn Statement to make their claim and that they could receive no money for the claim without completing the Sworn Statement. Tr. IV at 664. Thus, the scheme's success depended upon obtaining the Sworn Statement, and the mails were incident to this essential part. The mailing alleged to satisfy Count 8 was the mailing of the property loss report to Farmers' claim office by the Hollises' insurance agent, after the agent had been notified of the Hollises' claim. The scheme would not have succeeded had Farmers not received written notice of the claim, Tr. V at 915, and it was undisputed that the mails were used to give the notice. So again, the use of the mails was "incident to an essential part of the scheme."

■ However, proof that the mails were in fact used is not by itself sufficient. The government was also required to prove that the Hollises "knowingly cause[d]" the mails to be used. 18 U.S.C. § 1341. As interpreted, this language only requires a showing that the Hollises could reasonably foresee the use of mails. "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954) (citation omitted). *See also United States v. Warren,* 747 F.2d 1339, 1344–46 (10th Cir.1984); *United States v. Curtis,* 537

F.2d 1091, 1095 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976). The Hollises argue that the evidence was insufficient to meet even this standard. We disagree.

The mailings alleged to supply the use-of-mails element in both counts were made in the ordinary course of the claims-settlement process. Ronald Doke of Farmers testified, as to Count 4, that as a matter of company and industry policy, upon notice of a claim, Farmers mails to the insured a Sworn Statement form so the insured can submit it as required by the insurance contract. Tr. IV at 660–65. Marsha Thompson, an employee of the Hollises' agent, testified, as to Count 8, that for every property loss claim, the agent completes and files with the insurer a property loss report. Sometimes these reports may be "called in," but in cases involving storm loss, the written report must be mailed in. Tr. V at 914–16. This evidence, combined with evidence that the Hollises had owned and operated several insurance agencies, Tr. VII at 1629–30, permitted the inference that the Hollises caused, or could reasonably foresee the mailings. *See, e.g., United States v. Bortnovsky,* 879 F.2d 30, 38 (2d Cir.1989) ("The courts, when construing the mail fraud statute in the context of schemes to defraud an insurance company, have consistently held that defendants 'caused' mailings that are part of the ordinary claims process." (citations omitted)); *United States v. Kuzniar,* 881 F.2d 466, 472 (7th Cir.1989) (correspondence concerning documents that insured was contractually obligated to submit in support of claim was reasonably foreseeable); *United States v. Smith,* 934 F.2d 270, 273 (11th Cir.1991) ("We agree that it is foreseeable that communications ['between insurance agents and their home offices'] involving the policy, the details of the claim, or requests for the payment of the claim would be mailed."); *id.* at nn. 15–16 (citing cases).

## B. *Two Theories of Fraudulent Scheme.*

■ The Hollises next argue that the prosecution, with implicit support from the court's instructions, supplied two separate

theories of the fraudulent scheme alleged in Count 4: that no burglary in fact occurred as represented by the Hollises, or alternatively, that a burglary occurred, but the Hollises "padded" the claim with items represented as stolen that had in fact not been stolen. The Hollises argue that there was insufficient evidence to support a finding that a burglary never occurred. Consequently, they argue that since the jury may have inappropriately rendered its decision on that basis, the mail fraud conviction and related money laundering convictions should be reversed. *See, e.g., Zant v. Stephens,* 462 U.S. 862, 881, 103 S.Ct. 2733, 2745, 77 L.Ed.2d 235 (1983) ("[A] general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the verdict may have rested exclusively on the insufficient ground."). The argument is without merit.

Viewed in a light most favorable to the government, there was ample evidence in the record, as the government has carefully documented, *see* Br. of Plaintiff-Appellee at 7–20, to support a conclusion that the whole burglary was a hoax. The Hollises represented items as stolen (1) that had not been stolen, but had been relocated temporarily or otherwise; (2) that had never been owned by the Hollises, or (3) that had been purchased by the Hollises but later returned. To document some of these claims, the Hollises used falsified or forged receipts and invoices. The sheer number of falsified items supports the inference that the other items likewise had been represented as stolen using one of the same approaches. Further, the very fact that all the claims were so thoroughly documented was itself unusual, according to David Reinke, the insurance adjustor. Tr. II at 294. Pamela Hollis' explanation was that she had been audited by the I.R.S. for the previous three years. *Id.* This explanation was false. Tr III at 603; Tr. VI at 1404–05. Further, when questioned about their income to see if there was a financial motive, *see* Tr. II at 265, the Hollises lied and materially overstated their income. *Id.;* Tr. VI at 1356–65. Finally, the Hollis-

es' housekeeper and nanny noted that items (which they were told had been stolen) disappeared on the date of the burglary, only to reappear several months later. Tr. II at 182–84; Tr. IV 727–28.

In short, the degree of deceit, planning, calculation, and the Hollises' ability to make items disappear after the "burglary" that began to reappear a few months later allowed the jury to infer that the claimed burglary was itself staged, not merely a fortuitous event which allowed the Hollises to pad an otherwise valid claim. We will not set aside the jury's verdict as lacking sufficient evidence.

### C. *"No Evidence" in support of Count 8.*

■ The Hollises' argument that no evidence supports the guilty verdict of the mail fraud alleged in Count 8 is equally groundless. They argue that the evidence is more consistent with a theory that Jim Thomas devised and executed the scheme. While the evidence may have indicated that Thomas was criminally involved, that does not necessarily negate the criminal responsibility of the Hollises. The Hollises engaged in conversations with a Farmers insurance adjustor that indicated their awareness of the nature of the claim and the monies that had been spent. Tr. V 924–25, 953, 961–62. Among other things, the claim sought payment for the replacement of a security system and a telephone system which were substantially better than the systems which existed in the office building prior to the lightning strike. Tom Hollis signed the Proof of Loss. Tr. V at 935–36. Pamela Hollis paid for the telephone system. Tr. V. at 1061–62. Both Tom and Pamela Hollis wrote a check toward payment of the security system. Pamela Hollis was that aware the security system was an upgrade of the prior system, as she was trained as to the use and features of the new system. Tr. V at 1087–88. And, in any case, the jury rationally could have presumed that the Hollises were aware of the nature of the office building equipment being replaced. From this evidence, a rational jury readily could have concluded that the Hollises knew the

nature of the claim, the nature of the equipment installed, the nature of the equipment being replaced, and therefore that their claim fraudulently overstated the nature of the loss. The jury's verdict was supported by sufficient evidence.

## III. DOUBLE JEOPARDY

Next, the Hollises argue that the district court violated their rights against double jeopardy by imposing separate convictions and sentences for the bank fraud offenses, Counts 1–3, and for the mail fraud and money laundering offenses, Counts 4–7 and Counts 8–10.

■ In a single prosecution, the threat of multiple punishments under distinct statutes for the same conduct raises double jeopardy concerns. *See Grady v. Corbin*, 495 U.S. 508, 516, 110 S.Ct. 2084, 2090–91, 109 L.Ed.2d 548 (1990). However, since Congress has the power to impose cumulative punishment upon a single act or punish separately each step leading to the consummation of a transaction as well as the completed transaction, *Garrett v. United States*, 471 U.S. 773, 779, 105 S.Ct. 2407, 2411–12, 85 L.Ed.2d 764 (1985) (citing *Albrecht v. United States*, 273 U.S. 1, 11, 47 S.Ct. 250, 253–54, 71 L.Ed. 505 (1927)), "our review is limited to whether Congress intended multiple convictions and sentences under the statutes." *United States v. Morehead*, 959 F.2d 1489, 1506 (10th Cir. 1992).[3] In that regard, " 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.' " *Grady*, 495 U.S. at 516–17, 110 S.Ct. at 2090–91 (quoting *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983)).

To determine whether Congress intended that the violation of each statute be a separate offense, we first look to the language of the statutes and then to legislative history. *See United States v. Lovett*, 964 F.2d 1029, 1041 (10th Cir. May 19, 1992); *Morehead*, 959 F.2d at 1506. "If Congressional intent cannot be discerned, we apply the well-settled 'rule of statutory construction' set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." *Morehead*, 959 F.2d at 1506. *Blockburger* states:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of [an additional] fact which the other does not.

284 U.S. at 304, 52 S.Ct. at 182.

■ Under this analysis, Counts 1–3 do not implicate double jeopardy concerns, since the multiple violations do not arise from the same criminal behavior. The § 1344 bank fraud offenses alleged in Counts 1 and 2 involved schemes to defraud two different financial institutions. While the material misrepresentations told both victims were the same, the government was still required to prove essential facts for each offense not required by the other, such as the separate loans and the specific intent to defraud each financial institution. The § 1014 offense alleged in Count 3 arose only after the other two offenses had been committed, when the Hollises sent a new financial statement to First Interstate containing material false representations. Again, the Hollises were not found to violate this statute based the same conduct constituting another alleged offense. Since all three counts require proof of additional facts not required by another, the three counts properly charge three separate offenses.

With regard to the § 1341 and the § 1957 offenses charged in Counts 4–7 and 8–10,

---

**3.** In the case of successive prosecutions, a different standard applies. Under *Grady*, the Double Jeopardy Clause bars a subsequent prosecution in which the defendant is required to relitigate factual elements that constituted an offense charged in an earlier prosecution. 495 U.S. at 521, 110 S.Ct. at 2093. Here, however, all offenses have been charged within a single prosecution. The distinction is crucial. *See Grady*, 495 U.S. at 517 n. 8, 110 S.Ct. at 2091 n. 8. Multiple prosecutions raise a host of considerations not implicated by a single prosecution. *See id.* at 518–22, 110 S.Ct. at 2091–94. The Hollises' reliance on the *Grady* standard used for evaluating subsequent prosecutions is misplaced.

the double jeopardy question has been resolved by this court's recent decision in *United States v. Lovett, supra.* There, we found that while the prosecution of both a § 1957 offense and the required predicate offense failed the *Blockburger* test, Congress intended to punish both offenses separately. *Lovett* 964 F.2d at 1042. We concluded, therefore, that the prosecution and subsequent conviction of both offenses did not violate the Double Jeopardy Clause. *Id.* at 1042. *See also United States v. Edgmon,* 952 F.2d 1206 (10th Cir.1991) (convictions for both § 1956 and predicate offense did not violate Double Jeopardy Clause), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992). *Lovett* is indistinguishable from the current case and therefore dispositive.[4]

## IV. JURY INSTRUCTIONS

A. *Ignorance or Mistake of Law.*

■ The Hollises challenge the district court's instructions to the jury on two grounds. First, the Hollises argue that the court improperly instructed the jury as to the "willfully" requirement of 18 U.S.C. § 2(b), which was alleged in all counts of the indictment. The Hollises argue that in order to prove they "willfully" violated the law, the government was required to prove that they specifically intended to engage in conduct they knew to be a violation of the law. However, the court instructed the jury that every person is presumed to know what the law forbids. The Hollises argue that this instruction created an unconstitutional presumption as to their guilt and unlawfully shifted the burden of proof.

The claim may be summarily rejected. In *United States v. Dashney,* 937 F.2d 532 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991), we confronted and rejected a similar claim that the term "willfully," as contained in 31 U.S.C. § 5322, required a showing that defendant knew his conduct was illegal. There we noted:

"The meaning of the term 'willful' depends upon the context in which it is used, and *a requirement that an act be done 'willfully' normally does not necessitate proof that the defendant was specifically aware of the law penalizing his conduct.* Where the law imposes criminal liability for certain conduct, a requirement that the conduct be 'willful' generally 'means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.'"

*Dashney,* 937 F.2d at 538 (quoting *United States v. Scanio,* 900 F.2d 485, 489 (2d Cir.1990) (citations omitted)).

Arguing for a different result here, the Hollises rely on *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). This reliance is misplaced. "*Cheek* addresse[d] 'willfulness' in the context of criminal violations of federal tax statutes." *Dashney,* 937 F.2d at 539–40. In fact, *Cheek* emphasized the "general rule that ignorance of the law or a mistake of law is no defense," 111 S.Ct. at 609, and noted that courts historically had carved out an exception to the traditional rule and given special treatment to criminal tax offenses. In this case, the Hollises have offered no reason to interpret the term "willfully" in

---

**4.** The Hollises also argue that even if under some factual settings a defendant may properly be convicted under both statutes, here the scheme to defraud, as alleged in *this* indictment, encompassed depositing the checks in order to obtain the insurance money. Consequently, they argue they are being charged under both statutes for exactly the same conduct. Whatever difference this may have made if true, the fact remains that depositing the checks is not encompassed within any alleged element of the mail fraud counts. In Counts 4 and 8, the indictment alleges inter alia that the Hollises devised a scheme to obtain money. The Hollis-

es' actual success in obtaining the money (by negotiating the check or otherwise) was not alleged as an element of the offense, and properly so; it is axiomatic that success in obtaining the object of the scheme is not an element of mail fraud. *See, e.g., United States v. Curtis,* 537 F.2d 1091, 1095 (10th Cir.), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976). The crime was complete when the Hollises *devised* the scheme and used the mails in furtherance thereof. Hence, the subsequent monetary transactions involving funds derived from the fraudulent scheme constituted no part of the alleged mail fraud offense.

any sense other than that which is consistent with its traditional meaning. The district court's instruction that the Hollises were presumed to know what the law forbids was therefore proper.[5]

## B. *Repayment Defense.*

■ . Second, the Hollises argue that the district court erred in refusing a requested instruction that repayment of the loan could be taken into account and might negate specific intent to defraud the financial institutions.[6] Instead of accepting the instruction, the court instructed the jury that "repayment is not a defense to bank fraud." Instruction No. 22, App. of Appellant, Tab 8. The court did instruct the jury that it could not find the Hollises guilty without finding that they specifically intended to defraud the bank. *See id.*

While the defendant is entitled to an instruction as to his theory of defense if there is evidence to support it, *e.g., United States v. Pino,* 606 F.2d 908, 917 (10th Cir.1979), the court is not required to give an instruction that misstates the law or that is already covered by other instructions. *E.g., United States v. McKinney,* 822 F.2d 946, 949 (10th Cir.1987). As long as the instructions are correct statements of law, and fairly and adequately cover the issues presented, the trial judge is given substantial latitude and discretion in formulating the instructions. *United States v. Bryant,* 892 F.2d 1466, 1468 (10th Cir. 1989) (citations omitted), *cert. denied,* 496 U.S. 939, 110 S.Ct. 3220, 110 L.Ed.2d 667

(1990). Under these standards, we must reject the Hollises' argument.

■ A person violates the bank fraud statute when he knowingly executes a scheme to obtain money from a financial institution by means of false or fraudulent representations. 18 U.S.C. § 1344. Certainly, if a defendant never intended to provide false information, or if the misrepresentations were immaterial, then the defendant has a valid defense. However, if a defendant knowingly provided materially false information in order to induce the loan, the crime is complete, and it is irrelevant whether or not he intended to repay it or was capable of repaying it. *See, e.g., McKinney,* 822 F.2d at 949–50 (fact that "defendant later offers repayment, does not negate an earlier intent to defraud" under 18 U.S.C. § 656); *United States v. Benny,* 786 F.2d 1410, 1417 (9th Cir.) ("a good-faith belief that the victim will be repaid and will sustain no loss is no defense at all"), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *United States v. Acree,* 466 F.2d 1114, 1118 (10th Cir.1972) ("The offense occurred and was complete when the misapplication [under 18 U.S.C. § 656] took place. What might have later happened as to repayment is not material and could not be a defense."), *cert. denied,* 410 U.S. 913, 93 S.Ct. 962, 35 L.Ed.2d 278 (1973); *see also United States v. Kelley,* 929 F.2d 582, 585 (10th Cir.) (bank fraud does not require a showing of actual pecuniary loss), *cert. denied,* —— U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991).

---

**5.** The Hollises also objected to the district court's instruction that: "You may consider it reasonable to draw the inference and find a person intends the natural and probable consequences of acts knowingly done or knowingly omitted." Instruction No. 32, App. of Appellant, Tab 8. The Hollises argue that this instruction creates an unlawful presumption of the type condemned in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The claim is meritless, as this court has already upheld this instruction against the same challenge in *United States v. Vreeken,* 803 F.2d 1085, 1092 (10th Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

**6.** Appellants' Requested Instruction # 100 read:

You are instructed that repayment of the loan to First Interstate Bank and to the Metro Area Development Corporation can be considered by you as a defense to the charges contained within Counts one, two and three, Bank fraud and submitting a false statement. In that regard you are instructed that these crimes require that you find that the defendant or defendants had the specific intent to defraud the financial institutions. If you find that from the evidence presented that repayment negates the specific intent to defraud the financial institutions then you must find the defendants not guilty.

App. to Appellant's Br., Tab 36.

While the proposed instruction did not state that repayment *per se* is a defense, it implied that repayment might "negate" the specific intent to defraud. The import of this language is unclear. Properly, repayment could only "negate" specific intent if it makes it less probable that the Hollises knew that they were providing false information in order to induce the loan. However, here it was not likely that the rational trier of fact would conclude that the Hollises did not know they were submitting false tax returns because they were current on their repayment obligations. The more likely effect of the Hollises' instruction would be to invite the jury to equate intent to defraud the bank with intent to cause financial harm to the bank—a result directly contrary to the cases cited above. This tendency to mislead was sufficient reason to reject the instruction. *See McKinney*, 822 F.2d at 949–50 (district court did not err in rejecting instruction that "defendant's acts in protecting the banks from any loss may be considered by the jury to prove that the defendant lacked the requisite intent to defraud").

Further, if the theory of defense, distilled to its essence, was simply that the Hollises lacked the specific intent to defraud, evidence of which was provided by the fact that the loans were current, then the instructions given by the court adequately provided for the defense. The court's instruction that repayment is not a defense only made it difficult for counsel to rely on an invalid theory of defense, but it did not foreclose any rational factual argument (supported by the specific intent instruction) that the Hollises did not knowingly submit false information in order to obtain the loans. We find no error in the district court's refusal to give the tendered instruction.

## IV. GOVERNMENT'S REBUTTAL ARGUMENT

The Hollises allege prosecutorial misconduct stemming from two portions of the prosecution's rebuttal argument. In one portion, the prosecution made the following comments on the Hollises' assertion of their right to a jury trial:

You may ask yourself, "If it's so obvious [that defendants are guilty], why do we need to have a trial?" Well, there are several reasons. One is, and the best one is, because the Constitution says so. All the defendants have to do is say "Not guilty," and the Constitution guarantees them a full jury trial. It shouldn't be any other way....

You might say, "Well, if it's so obvious, how could they hope to win?" And think about, lots of things could have happened to prevent us from getting where we are today.

The witnesses could have been intimidated. Trudy O'Connor could have been intimidated. She could have lied.

Vicky Keeney could have continued to lie to the FBI.

Lynette Tate could have been backed off because she doesn't want to have to be accused of having some affair in front of people.

Shelly Cowan can be intimidated because she doesn't want to be cross-examined about her personal life in front of a bunch of strangers.

Those things could have happened, but they didn't.

The witnesses might have forgotten. Maybe Melinda Fritze wouldn't remember which documents the accountant gave her and which ones they got from Pamela.

Maybe the files don't get subpoenaed some way.

Maybe the evidence gets kicked out on some legal deal.

But none of those things have happened. None of those things have happened. The evidence is all here. The evidence has all happened.

And if you vote innocent ... they are going to laugh at you, because the evidence is clear.

Tr. IX at 2005–06.

■ The Hollises maintain that the import of this argument was that the Hollises' decision to exercise their constitutional right to a jury trial was evidence that they

were guilty. This comment on the exercise of a fundamental constitutional right, they say, violated the principles of a fair and impartial jury trial and removed the presumption of innocence.

Whether or not the prosecutor's statements rise to the level of constitutional error, the Hollises face a greater hurdle. They failed to preserve the issue for review by failing to object contemporaneously to the argument below. Therefore, we will only reverse for plain error. *United States v. Lonedog,* 929 F.2d 568, 570 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 164, 116 L.Ed.2d 129 (1991). " 'Plain error is *"fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." ' " *Id.* (quoting *United States v. Henning,* 906 F.2d 1392, 1397 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991)). We apply a plain error analysis even when the error to which defendant failed to object is of constitutional dimension. *See, e.g., United States v. Rogers,* 921 F.2d 975, 978 (10th Cir.1990); *United States v. Taylor,* 800 F.2d 1012, 1017 (10th Cir.1986), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). And in determining whether plain error occurred, we review the prosecutor's remarks in the context of the entire record, including evidence presented and the court's instructions to the jury. *See United States v. Young,* 470 U.S. 1, 16, 19–20, 105 S.Ct. 1038, 1046–47, 1048–49, 84 L.Ed.2d 1 (1985); *United States v. Ellzey,* 936 F.2d 492, 497–98 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 400, 116 L.Ed.2d 350 (1991).

Here there was no plain error. The prosecutor's soliloquy was more loquacious than prejudicial. One cannot infer from the prosecutor's remarks that a defendant is more likely to be guilty simply because he pled not guilty and requested a jury trial. Presumably even an innocent defendant might plead not guilty and request a jury trial. While there is some suggestion that the Hollises (because they were guilty) may have requested a jury trial in order to engage in various improper tactics to protect themselves—a suggestion that is inappropriate—the prosecutor did not ask the jury to infer guilt from the Hollises' status as defendants or because they submitted to a jury trial. Any inference to that effect, in any case, was mitigated by the court's Jury Instructions No. 3 "Plea and Presumption of Innocence" and No. 4 "Burden of Proof—Reasonable Doubt," App. of Appellant, Tab 8, that made it clear that the Hollises' status as defendants at trial was not evidence of guilt. In light of this and the overwhelming evidence of the Hollises' guilt manifest in the record, we cannot say that the remarks were so prejudicial that "justice cannot have been done." [7]

■ The Hollises also claim that the prosecution misstated the law as to the bank fraud counts in its closing arguments. The government stated:

Mr. Martin wants me to tell you how the bank has been defrauded even though the payments are getting made, and I'm going to do that.

. . . .

All right, here's how the bank fraud works. As the judge has instructed you, as a matter of law, even if they're making the payments on the loan, they can still be guilty of bank fraud, and there's good reason for that.

Banks get to take mortgages in these properties. They get to have the power of sale. That's the way they protect

---

**7.** The Hollises argue to the contrary that the error was of such a magnitude that "it could never be considered harmless" and that it should be the basis of reversal, even in the absence of a contemporaneous objection. While in carrying out a harmless-error analysis the Supreme Court has identified certain errors to be of that magnitude, and while the occurrence of such an error might also constitute "clear error," the universe of these errors is extremely small, consisting only of errors that implicate a "structural defect," such as the denial of the right to counsel and denial of the right to an impartial judge. *See Arizona v. Fulminante,* — U.S. —, — – —, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991). The improper comment on a defendant's silence at trial, in violation of the Fifth Amendment, for example, is subject to harmless error analysis. *See id.,* 111 S.Ct. at 1263 (citing *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)).

themselves, and as perfectly normal, regular banking process and part of the federally insured banking system that they get to do this. *The way the defendants chose to defeat this mortgage is by conveying the property away.*

. . . .

So what happens? They start missing payments, they get behind on the loan, the bank is insecure. Federally insured bank is insecure, the SBA is insecure. What happens?

Then it comes time to talk about maybe foreclosing on the property, "Let's see about these mortgages," and First Interstate comes out of the column of people who are going to give them money and goes over to the column of people who want to get money from them.

And what happens? Just like the ex-wife and the government, all of a sudden they say, "No, no, that's not our property. We conveyed it away to Mr. and Mrs. Brown, and you can't have it."

And the mortgage, it's not signed by Mr. and Mrs. Brown; the power of sale, it's not signed by Mr. and Mrs. Brown; the loan agreements, the notes, they're not in there anywhere. And the bank, federally insured bank, is out of luck; the SBA is out of luck.

There are laws to protect them from exactly that circumstance, . . . and when it happens, you end up in a federal courtroom in a trial, and here we are.

Tr. IX at 1996–2000 (emphasis added).

Certainly, it is improper for the prosecution to misstate the law in its closing argument. While much of the prosecutor's discussion is incomprehensible, the arguments did give the impression that the sale of the office building property defeated the lenders' security interest in the property, harming the lenders; that the bank fraud laws prevent these sales for precisely that reason; and that the Hollises transferred the property to defraud the lenders. These statements were inappropriate and misleading. Apart from the questionable accuracy as to the effect of a subsequent sale on a mortgagee's rights, the prosecution never alleged that the transfer of the office building property itself in any way constituted bank fraud. The suggestion that the bank fraud laws were designed to protect banks from borrowers that sell property in which the banks hold a mortgage was equally mischievous.

However regrettable these remarks may have been, though, defense counsel should have objected to them at the time they were made so that steps could have been taken to correct any error. On appeal, we cannot find plain error. The district court correctly instructed the jury on the elements of bank fraud. Generally, we presume that the jury followed the court's legal instructions, not the prosecutor's. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). Further, the record contained ample evidence supporting a jury verdict under the proper legal standards. Therefore, notwithstanding the prosecutor's comments, we do not find that "justice cannot have been done."

## V. *EX PARTE* SUPPLEMENTARY INSTRUCTION

The Hollises, particularly Pamela Hollis, assert that the trial court committed reversible error when it answered a juror request for a supplemental instruction during deliberations, without notifying them and out of their presence.

During deliberations, the jury foreman sent the following note:

Concerning the money laundering counts, we have a question.

Does it have to be proven that the entire $10,000 was derived from criminal proceeds, or is it sufficient to know that some portion of the $10,000 + was criminally derived?

App. of Appellant, Tab 7.

At the bottom of the note, the following answer was given and apparently returned to the jury:

An element of the offense of money laundering is that it must involve in excess of $10,000 which was criminally derived

It must be proved that in excess of $10,000 was criminally derived

*Id.*

■ The record is silent as to the exchange. However, in its brief, the government asserts that the court considered the jury request in the presence of Pamela Hollis' trial counsel, who is not her appellate counsel, Tom Hollis' trial counsel, and government counsel. Since there were no objections, no court reporter was summoned. Br. of Plaintiff–Appellee at 58.

Nevertheless, if in fact the answer was given out of the presence of Pamela and Tom Hollis and their counsel, then the district court violated Fed.R.Crim.P. 43.

Federal Rule Crim.Proc. 43 guarantees to a defendant in a criminal trial the right to be present "at every stage of the trial including the impaneling of the jury and the return of the verdict." Cases interpreting the Rule make it clear, if our decisions prior to the promulgation of the Rule left any doubt, that the jury's message should have been answered in open court and that petitioner's counsel should have been given an opportunity to be heard before the trial judge responded.

*Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2095, 45 L.Ed.2d 1 (1975) (citations omitted). However, a Rule 43 violation is still subject to the harmless-error analysis of Fed.R.Crim.P. 52(a). *See Rogers*, 422 U.S. at 40, 95 S.Ct. at 2095. Here, if there was a violation, it was harmless, as the supplementary instruction given was entirely accurate.

Pamela Hollis argues that the instruction was erroneous, however. She reads the second sentence of the hand-written answer to state: "It must be proved that in excess of $40,000 was criminally derived." The source of this reading is a strike on the dollar sign ("$") that touches the number "1", making it resemble a number "4." The suggestion that the district court intended to write $40,000, or that the jury may have interpreted the note in this manner, is untenable. In light of the original court instructions, the jury's question, and the first sentence of the court's answer, there is no room for any rational reading

other than $10,000, and the jury's acquittal of Tom Hollis on the Count 9 money laundering offense demonstrated that the jury understood its role.

## VI. IMPROPER JOINDER OF OFFENSES

Tom Hollis argues that the offenses arising from the three separate criminal episodes were improperly joined in violation of Fed.R.Crim.P. 8(a) ("Rule 8(a)") and that the district court abused its discretion in not severing the offenses under Fed.R.Crim.P. 14 ("Rule 14"). We disagree.

A question of misjoinder under Rule 8 is a question of law, subject to *de novo* review. *See United States v. Cardall*, 885 F.2d 656, 667 (10th Cir.1989). There was no misjoinder. Rule 8(a) provides that "[t]wo or more offenses may be charged in the same indictment ... in a separate count for each offense if the offenses charged ... are of the same or similar character." Here the offenses arising from the bank fraud and the two mail fraud schemes are "of the same or similar character," Rule 8(a); in each case, the Hollises allegedly defrauded the victim of money through the submission of falsified documents. There was no error in that respect.

■ Nevertheless, even in the absence of a misjoinder under Rule 8(a), the court may order the separate trials of counts "[i]f it appears that a defendant ... is prejudiced by a joinder of offenses." Rule 14. In deciding on a motion for severance, the district court has a duty to weigh the prejudice resulting from a single trial of counts against the expense and inconvenience of separate trials. *Cardall*, 885 U.S. at 668.

"The decision whether to grant or deny severance is within the sound discretion of the trial court, and will not be disturbed on appeal unless there is an affirmative showing of an abuse of discretion." *Cardall*, 885 F.2d at 667 (citation omitted). "The burden of the defendant to show an abuse of discretion in this context is a difficult one." *United States v. Valentine*, 706

F.2d 282, 290 (10th Cir.1983) (citations omitted).

■ Before the district court, Tom Hollis presented two justifications for severing the counts. First, he argued that he would be required to convince a jury that "he did not commit any of the three separate, distinct and unrelated alleged criminal episodes that the government has alleged." Mem. of Mar. 25, 1991 at 5, App. to Appellant's Br., Tab 26. This "volume of episodes is prejudicial to the defendant," he asserted. *Id.* Second, he stated that he intended to testify as a witness in his defense at trial, but only concerning Counts 4–10. This would prejudice him, he argued, because the jury would wonder why he did not testify as to Counts 1–3, and because he might be required to exercise his Fifth Amendment privilege against self incrimination in the presence of the jury. *Id.*

Neither rationale mandated a severance. The district court was not required to sever the counts simply because the cumulative effect of evidence of similar misconduct might potentially prejudice the defendant. *See United States v. Cox,* 934 F.2d 1114, 1120 (10th Cir.1991); *United States v. Taylor,* 800 F.2d 1012, 1017 (10th Cir.1986) (defendant charged with two separate armed robberies), *cert. denied,* 484 U.S. 838, 108 S.Ct. 123, 98 L.Ed.2d 81 (1987). "[T]he mere fact that a defendant may have a better chance for acquittal by separate trials of charges is not sufficient to require severance." *Valentine,* 706 F.2d at 290 (citation omitted).[8] Moreover, as the district court found, had separate trials been granted, the evidence of similar conduct would likely have been admissible anyway under Fed.R.Evid. 404(b), as showing intent or lack of mistake, etc. *Accord United States v. Rabbitt,* 583 F.2d 1014, 1022 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *United States v. Evans,* 796 F.2d 264, 265 (9th Cir.1986).

■ As to the second rationale, in *Valentine, supra,* we established guidelines to be followed in determining whether a multi-count indictment should be severed because of a defendant's desire to testify:

> "[N]o need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration' against the defendant's interest in having a free choice with respect to testifying."

*Valentine,* 706 F.2d at 291 (quoting *Baker v. United States,* 401 F.2d 958, 977 (D.C.Cir.1968), *cert. denied,* 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970)). Here, the district court found that Tom Hollis did not meet this burden and "failed to make *any* showing regarding his need to testify regarding certain counts and to refrain from testifying on other." Order of April 29, 1991 at 6, App. to Appellant's Br., Tab 28 (emphasis added). A defendant cannot require a severance by simply informing the court that he intends to testify as to some counts but not as to others. *Valentine,* 706 F.2d at 290–91. Tom Hollis has recited no evidence to suggest that he did more than that. Under these circumstances, therefore, we find that the district court did not abuse its discretion in refusing to sever the counts.

## VII. COMPELLED TESTIMONY UNDER *GARRITY*

■ Tom Hollis also claims that the district court erred in admitting certain sworn

---

**8.** The "volume of episodes" itself was not likely to prevent the jury from independently and fairly evaluating each offense. The nature of the jury's inquiry as to each of the episodes was similar: whether the Hollises made materially false representations; whether they knowingly did so; whether they had the specific intent to defraud the institutions, etc. Thus, the jury was not likely to be confused, as it might have, had the offenses been of a different character, and the jury could easily classify and evaluate the evidence corresponding to each alleged crime.

statements that he and his wife made. Relying on *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), he claims that admission of the statements violated his privilege against self-incrimination.

The sworn statements in question were made to William Cathcart, an attorney for Farmers, in connection with the burglary claim. The Hollises were represented by counsel at the examination, and they were told that if they failed to submit to the examination, their claim could be denied.

In *Garrity*, the Supreme Court held that statements compelled by the government are inadmissable. The case concerned police officers who were questioned during a state investigation of traffic ticket "fixing." Each officer was warned that anything he said might be used against him in a criminal proceeding and that if he refused to answer he could be fired. The Court held that the threat of losing their jobs to induce the officers to give up their privilege against self-incrimination made the officers' statements involuntary and therefore inadmissable in the criminal proceedings. *Id.* at 497, 87 S.Ct. at 618–19.

As in *Garrity*, Tom Hollis claims that his and his wife's statements were involuntary because of the threat that a refusal to speak would result in the loss of their claim. He further claims that the compulsion was state action because the attorney for Farmers was acting as an agent of the government, because Cathcart knew at the time the Hollises gave their sworn statements that the grand jury had subpoenaed Cathcart's files concerning the Hollises. We disagree.

There was no government compulsion to speak. Cathcart examined the Hollises as a private attorney acting solely on behalf of Farmers, as permitted by the contract between the company and the Hollises. The grand jury subpoena did not create an agency relationship between Cathcart and the government. Cathcart had already planned to examine the Hollises before he received the grand jury subpoena. In fact,

Tom Hollis' attorney conceded at trial that Cathcart was not an agent of the government. Thus, "absent some *officially coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *Oregon v. Elsted*, 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985) (emphasis added).

## VIII. SENTENCING

Finally, the Hollises argue on several grounds that their sentences exceed the maximum amount permitted under the Sentencing Guidelines. "In evaluating these arguments, we are mindful that the district court's application of the Sentencing Guidelines to the facts of a particular case is entitled to due deference and its factual findings will not be reversed unless clearly erroneous. 18 U.S.C. § 3742(e). However, we will remand for resentencing if the Guidelines were incorrectly applied. 18 U.S.C. § 3742(f)(1)." *United States v. Urbanek*, 930 F.2d 1512, 1514 (10th Cir.1991) (citation omitted).

### A. *Role in Offense.*

▇▇▇ The Hollises first argue that the district court improperly increased their offense level by two points under U.S.S.G. § 3B1.1(c), for their role in the offense. That section calls for a two-level increase if "defendant was an organizer, leader, manager, or supervisor in any criminal activity" other than one described in other provisions (sections 1(a) and (b)) that involve five or more participants. The Hollises instead argue that no adjustment should be made, as required by U.S.S.G. § 3B1.4, since the offenses were committed "by individuals of roughly equal culpability," *id.*, comment.

Prior to sentencing, the district court was presented with evidence that the offenses involved upwards of eight participants,[9] including Tom and Pamela Hollis, Jim Thomas, who allegedly assisted in the fraudulent lightning strike claim and in carrying out the false burglary; Jim Co-

---

**9.** "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, comment. (n. 1).

wan, who allegedly assisted in executing the false burglary; Eddie Elkins, the Hollises' accountant, who confessed to signing the false tax returns submitted to the lenders in connection with the bank fraud; Vicki Keeney, who was asked to destroy evidence and lie to the FBI; and C.J. and Ruby Brown, Pamela Hollis' parents. *See* Presentence Aff. of Garland E. Slate, Jr. at 3–4, App. to Br. of Appellee, Tab 15.

However, the district court determined:

> The evidence presented at the sentencing hearing was not sufficient to convince the Court that Pamela Hollis was the leader or organizer of five or more participants. The same is true of defendant William T. Hollis.
>
> However, there is a preponderance of the evidence which does show that each was an organizer, leader, manager or supervisor in a criminal activity other than that described in Section 3D1.1[ (a) and (b) ].

Tr. of Aug. 6, 1991 at 100–01, App. of Appellant, Tab 51.

We review the district court's factual determination that the Hollises exercised a leadership role under the clearly erroneous standard. *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 341, 116 L.Ed.2d 280 (1991). Our review of the evidence presented to the district court finds ample support for the court's finding that the Hollises were not acting alone, but were instead carrying out a supervisory role over other participants in the offenses. The court's conclusions were not clearly erroneous.

### B. *Acceptance of Responsibility.*

 The Hollises also argue that they were improperly denied a two point downward adjustment for their acceptance of responsibility. Under U.S.S.G. § 3E1.1, the offense level should be reduced "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct."

The Hollises argue that their "voluntary payment of restitution" of certain moneys and their willingness to enter into settlement negotiations evidenced their acceptance of responsibility. However, the district court reached the contrary conclusion:

> With regard to acceptance of responsibility, it need only be said that there has been none. Any arrangement for the payment of partial restitution was done to avoid forfeiture, was not the type of act that qualifies under any construction of the law as an acceptance of responsibility, and there simply is no basis for it.

Tr. of Aug. 6, 1991 at 100, App. of Appellant, Tab 51. Whether the Hollises accepted responsibility is a factual issue subject to the clearly erroneous standard. *United States v. Dennison*, 937 F.2d 559, 566 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992).

The Hollises assertion of voluntary restitution does not amount to an acceptance of responsibility. The commentary only refers to "voluntary payment of restitution *prior to adjudication of guilt.*" U.S.S.G. § 3E1.1, comment. (n. 1(b)) (emphasis added). The Hollises signed a consent judgment as to $35,000 that had previously been seized, but this was done only after they had been found guilty. Likewise, the Hollises placed $55,000 in escrow prior to the trial, but this would only be turned over if they were found guilty.

Similarly, the Hollises willingness to settle prior to trial cannot serve as proxy to an affirmative acceptance of personal responsibility. The Hollises offered, for example, to pay $90,000 in restitution in an attempt to avoid an indictment altogether. They also rejected proposals advanced by the government. Consequently, the Hollises showed a willingness to concede responsibility only to the extent they could avoid the consequences of their criminal conduct. The conditional willingness to enter into a beneficial agreement does not "clearly demonstrate[ ] a recognition and affirmative acceptance of personal responsibility for [ ] criminal conduct." The district court's determination was not clearly erroneous.

## C. *Obstruction of Justice.*

 Next, the Hollises claim the district court erred in enhancing the Hollises' offense level by two points under U.S.S.G. § 3C1.1. This section requires the increase "[i]f the defendant willfully impeded or obstructed, or attempted to impede or obstruct, the administration of justice during the investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1.

The district court gave several reasons for the enhancement:

> Vicky Keeney, a potential witness, was told by defendant William T. Hollis to lie to the FBI, and that action alone is enough to qualify as an obstruction of justice. Defendant Pamela Hollis met with her husband and Vicki Keeney when this act of obstruction took place, and it is attributable to both defendants.
>
> Moreover, Defendant Pamela Hollis participated in the preparation of a false deed which was used as evidence in the trial. The circumstances of the deed itself and the conflicting sworn testimony of Mrs. Brown in regard to the deed established by a preponderance of the evidence that the deed was false. This is directly attributable to Defendant Pamela Hollis and is but another act of obstruction which qualifies for the enhancement.
>
> . . . .
>
> In addition, William T. Hollis threatened a potential witness regarding her testimony. This is directly attributable to him and is clearly an obstruction of justice.

Tr. of Aug. 6, 1991 at 99–100, App. of Appellant, Tab 51.

We review the district court's factual determinations as to the obstruction of justice under the clearly erroneous standard, *Urbanek,* 930 F.2d at 1514, and based on this record, we cannot find that the district court's factual findings alluded to above were clearly erroneous. Having made these findings, the district court correctly applied the guidelines. The commentary makes clear that the enhancement was intended to be applied when a defendant directs another to destroy or conceal evidence, *see* U.S.S.G. § 3C1.1, comment. (n. 1(b)),[10] produces or attempts to produce a false document, *see id.,* comment. (n. 1(c)), or threatens or intimidates a witness, *see id.,* comment. (n. 1(d)). This is precisely what the district court found to have happened here. No error was committed.

## D. *Excessive Fine.*

 The Hollises claimed that the fine imposed by the district court was excessive. The district court calculated the fine range to be $141,598 to $424,794, based on the pecuniary gain to the appellant as the minimum, *see* U.S.S.G. § 5E1.2(c)(1)(B), and three times that amount as the maximum, *see id.* (c)(2)(C). The district court was required to impose a fine in all cases, U.S.S.G. § 5E1.2(a), and it imposed on each appellant a fine of $141,598, which it explicitly stated was "based on the minimum of the guideline range." *See* J. of William T. Hollis at 5 of 7, App. to Appellant's Br., Tab 46; J. of Pamela Sue Hollis at 5 of 7, App. of Appellant, Tab 22. However, the district court also ordered restitution by each appellant in the amount of $141,598. All parties agree that the effect of this was to reduce the *minimum* of the fine range to $10,000. *See* U.S.S.G. § 5E1.2(c).[11] Because of this, the Hollises urge us to revise the sentence and impose the minimum fine of $10,000. The government asks us to uphold the fine, since it was still within the proper fine range.

We reject both approaches. It is evident that the district court miscalculated the fine range. Further, it is impossible to determine whether the district court would

---

**10.** *During the incident involving Ms. Keeney, Tom Hollis, who was accompanied by Pamela, asked Ms. Keeney to dispose of a typewriter that the Hollises had previously loaned to her and which had been listed as stolen on the burglary report.*

**11.** U.S.S.G. § 5E1.2(c)(1) provided that: "The minimum of the fine range is the greater of: (A) the amount shown in column A of the table below [which was $10,000 for an offense level of 23]; or (B) the pecuniary gain to the defendant, *less restitution made or ordered.*" (emphasis added).

have imposed a fine of $10,000, or $141,598, or some other amount, had it believed the minimum was $10,000. *See United States v. Washington–Williams*, 945 F.2d 325, 326–27 (10th Cir.1991) (discussing ambiguity created by the incorrect fine range identified in the judgment). The "choice of the wrong guideline range is an incorrect application of the Sentencing Guidelines." *Id.* at 326 (citations omitted). As required by 18 U.S.C. § 3742(f)(1), therefore, we vacate the fine and remand both cases for further sentencing proceedings to reconsider the imposition of a fine within the correct fine range.

E. *Disparity in Sentences.*

Finally, Tom Hollis complains that his sentence of 57 months imprisonment was arbitrary, since his wife's sentence was for 46 months, and she was the more culpable of the two. We disagree. Whatever reasons the district court may have had for imposing different sentences, and they may be several,[12] they are not reviewable by this court, as long as they fall within the applicable guideline sentence range. *See, e.g., United States v. Garcia*, 919 F.2d 1478, 1482 (10th Cir.1990). Tom Hollis concedes that the sentence falls within the applicable guideline sentence range of 46 to 57 months, for a total offense level of 23. Therefore, we decline to review that portion of the sentence.[13]

For the reasons stated above, we VACATE each fine and REMAND the cases for reconsideration of the imposition of a fine in accordance with this opinion. In all other respects, the Hollises' convictions and sentences are AFFIRMED.

---

12. For example, Tom Hollis was convicted of an additional money laundering offense of which Pamela Hollis was not convicted. Further, Tom Hollis himself requested at sentencing that the court "would have some type of leniency towards my wife." Tr. of Aug. 6, 1991 at 103, Br. of Plaintiff-Appellee at 71.

13. The Hollises also argued that the district court erred in not ordering a downward departure from the guidelines under 18 U.S.C. § 3553(b). The Hollises now concede that the refusal to depart downward is not reviewable. *See United States v. Davis*, 900 F.2d 1524, 1528–30 (10th Cir.1990).