**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 21, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DELBERT TYLER TREVINO,

    Defendant - Appellant.

No. 24-2170
(D.C. No. 2:23-CR-00066-RB-1)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **PHILLIPS**, **EBEL**, and **EID**, Circuit Judges.

_____

Delbert Tyler Trevino was federally indicted for firearm and ammunition offenses. The most serious charge was for his knowing possession of an unregistered rifle whose barrel was less than sixteen inches long. The others were for his willful receipt of ammunition while under felony indictment.

At trial, Trevino testified about an earlier interaction with the El Paso police. The police had seized two firearms from his car during a shoplifting arrest. When he later asked for the firearms back, the police obliged, despite his then being on probation and prohibited from possessing firearms and

_____

[*] Except under the doctrines of law of the case, res judicata, and collateral estoppel, this order and judgment is not binding precedent. But it may be cited for its persuasive value, consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

ammunition. One of the firearms was a modified, thirty-inch rifle with a barrel measuring just over ten inches long. The police returned it with a property-release form marked "LONG RIFLE, AMERICAN TACTICAL."

With little explanation, Trevino contended that because the El Paso police returned his rifle and described it as a "LONG RIFLE," he was less likely to have known that the rifle's barrel was shorter than sixteen inches. And if the jury found that he hadn't known the barrel's length, the government would have failed to prove the knowledge element of his short-barreled-rifle charge. Separately, he contended that the police's returning his firearms justified a belief that his probation conditions—a mix of rules imposed by Texas and New Mexico—had been lifted, allowing him once again to lawfully possess firearms and ammunition. And if the jury found that he hadn't known that it was unlawful to receive ammunition, the government would have failed to prove the "willfulness" element of his ammunition charges.

The government objected to the introduction of the release form and the testimony about the El Paso police's returning the firearms. It argued that Trevino was using the evidence to assert the affirmative defense of public authority. Under that defense, a defendant prevails if he proves that a government official authorized him to do something the defendant knew was illegal. The government pointed out that Trevino had failed to provide pretrial notice of any public-authority-style affirmative defenses under Rule 12.3 of the Federal Rules of Criminal Procedure.

2

At first, the district court declined to admit the evidence, ruling that it contained hearsay and wasn't relevant. But during Trevino's direct examination, the court admitted the release form as relevant to his knowledge of the rifle's barrel length. The court also allowed Trevino to testify that the El Paso police's returning the firearms made it more likely that he thought he could lawfully receive ammunition. The court continued to bar him from using the evidence to support an affirmative defense.

During closing argument, Trevino's counsel recounted the evidence about the El Paso police without objection until he implored the jury, "The police gave [the firearms] back to him. And if we can't trust that, what can we trust in the United States?" R. vol. I at 813. That sparked a government objection for straying into a public-authority defense, or one "by some other name." *Id.*

At the ensuing bench conference, the court explained how Trevino's counsel had exceeded the court's earlier limits: "You're arguing now that the police gave it to him; it must have been okay. That's Public Authority. And we had this discussion time and again." *Id.* The court repeated that "[y]ou're taking the position here that they told him he could, so it was okay, so it must have been okay." *Id.* at 814.

After the government requested that the court strike counsel's comments, the court did so. Referring to counsel's "suggestion" that "because the police in El Paso gave [Trevino] the guns, it was okay for him to have the guns relative

to this entire proceeding," the court instructed the jury that counsel's comments were "not an accurate statement of the law." *Id.*

On appeal from his conviction, Trevino argues that the court mistook his remarks as asserting a public-authority defense rather than negating the mens rea elements of the charged offenses. But the court never stopped Trevino from arguing that the evidence somehow made it less likely that he knew either that his rifle's barrel length was less than sixteen inches or that he unlawfully received ammunition. Though the court mistakenly understood him as making a public-authority defense, it correctly prohibited him from arguing that because the El Paso police returned his firearms, the jury could acquit him no matter what he knew. His counsel had already made proper mens rea arguments and was free to make them again. But he instead chose to "move on." *Id.*

The district court didn't err in sustaining the government's objection and striking parts of Trevino's closing argument. We affirm.

## BACKGROUND

I.    **Factual Background**

A.    **Texas**

In late 2020, a Texas state grand jury indicted Trevino for three felony offenses: car theft, drug possession, and possessing identifying information of others with intent to harm or defraud. Trevino was released on bond pending trial.

4

Sometime the next year, Trevino was arrested in El Paso for shoplifting. During the arrest, El Paso police saw a Glock handgun and an American Tactical AR-15 rifle inside Trevino's car. The police confiscated the firearms "for safekeeping." *Id.* at 687.

In early 2022, Trevino pleaded guilty to the three Texas felonies. The court deferred adjudication on the guilty pleas subject to Trevino's completing five years' probation. His terms of supervision included a ban on his possessing or transporting "any type of firearm, prohibited weapon, or body armor." Supp. R. vol. II at 17.

Trevino and his Texas probation officer eventually decided that El Paso wasn't the best place for Trevino "to get back on [his] feet." *See* R. vol. I at 683–84. So a few months after pleading guilty, he transferred his supervision to New Mexico, where his then-girlfriend lived. On June 13 and 17, he agreed to New Mexico's probation conditions, including one that prohibited him from possessing "firearms, ammunition, or other deadly weapons." Supp. R. vol. II at 45–46, 48–50. His New Mexico probation officer told him that Texas's conditions would remain in effect as well.

But Trevino wanted to reclaim his firearms from the El Paso police. And the police had given him a property receipt stating that he would forfeit the

5

firearms if he didn't reclaim them soon. So on June 22, he called the officer who had seized the firearms and asked for permission to reobtain them.[1]

After running a background check, the officer okayed Trevino's request, apparently not knowing about Texas's and New Mexico's prohibitions. On June 29, Trevino showed up at the El Paso police station and reobtained the firearms. As with all property returned by the police, the firearms came with release forms. One form listed the rifle as a "LONG RIFLE, AMERICAN TACTICAL."[2] *Id.* at 1; R. vol. I at 691.

Trevino transported the firearms to his new home in Las Cruces, New Mexico. According to his then-girlfriend, Trevino "wanted to [drive] in separate vehicles" on the way back "so, that way, if there was an issue with the state lines, [they] wouldn't get in trouble." R. vol. I at 746. She also testified that Trevino disassembled the firearms before transporting them in his own car. For his part, Trevino testified that he hadn't worried about moving the firearms across state lines, nor disassembled them before doing so.

**B.    New Mexico**

By mid-August 2022, Trevino had settled in Las Cruces. He twice purchased ammunition from a local sporting-goods store—first on July 22, and

---

[1] At Trevino's request, his then-girlfriend also tried unsuccessfully to retrieve the firearms for him.

[2] "American Tactical" is the trade name of the company that assembled the rifle's components. Nothing in the record explains the "long rifle" designation. The entire rifle was 30.37 inches long.

again on August 12. Both times, he used his own name, debit card, and loyalty-account number.

Trevino had also landed a job as a surgical technologist at a veterinary hospital. There he met Alice Baumann, a semi-retired veterinarian. Baumann and her husband, Henry Kopp, were planning a vacation and needed someone to tend their pecan farm and pets while they were away. Kopp would also need a ride to and from the airport when he returned from vacation to fly to Houston for medical treatment. The couple asked Trevino if he would help, and he agreed to do so. So they showed Trevino their property and left him the keys to their house and truck.

Upon Kopp's return from vacation, Trevino picked him up at the airport. After Kopp stowed his luggage in the back of the truck, Trevino said, "I guess you noticed my rifle?" *Id.* at 428–29. Kopp saw the rifle resting behind the driver's seat.

After arriving back at the house, Trevino "really wanted to show [Kopp] the gun" and said he was "really proud" of it. *Id.* at 429. According to Kopp, Trevino explained that "he had made modifications to it," like installing a "more sensitive trigger," a "flash arrester,"[3] and an "offset scope." *Id.* Trevino also mentioned that he had shortened the barrel. Later that morning, Trevino and Kopp fired the rifle for target practice.

---

[3] Kopp was likely referring to a flash suppressor, also known as a "muzzle break" or "flash hider."

A couple of days later, Kopp flew to Houston for what he expected would be a month-long medical stay. But he returned almost immediately after testing positive for COVID-19. The next morning, September 2, he saw local law-enforcement officers outside his house.[4] The officers soon obtained and executed search warrants for the house and Kopp's truck.

During the search, officers seized Trevino's rifle from the guest bedroom. Trevino was present and told one officer that he had built the rifle himself. A different officer measured the rifle's barrel at about thirteen inches, which included the attached flash suppressor. That officer notified his supervisor, who contacted the ATF.

A few days later, an ATF agent measured the rifle's barrel at thirteen inches, again by including the attached flash suppressor. That agent then sent the rifle to an ATF lab. At the lab, a different agent detached the suppressor and, sliding a cylindrical ruler down the rifle's barrel, precisely measured the barrel at 10.62 inches.[5]

---

[4] The officers were there based on information that Trevino had recently shot and killed a woman. The jury in the present case was not told why the police were at Kopp's residence.

[5] The second agent testified that to count toward a barrel's length, a suppressor must be "permanently welded and pinned to the front of the barrel." R. vol. I at 603.

## II.    Procedural History

### A.    Indictments

On January 13, 2023, a grand jury in the District of New Mexico indicted Trevino on one count of knowingly possessing, on or about September 2, 2022, an unregistered "rifle with a barrel length less than 16 inches and an overall length less than 26 inches." R. vol. I at 24; *see generally* 26 U.S.C. §§ 5845, 5861(d). On April 17, 2024, the grand jury returned a second superseding indictment, charging the same count as above and adding two counts for Trevino's willfully receiving ammunition while under felony indictment in Texas. *See generally* 18 U.S.C. §§ 922(n), 924(a)(1)(D).

### B.    Trial

At trial, the jury heard two full days of testimony. Because the sole issue now on appeal is whether the district court erred in its rulings during Trevino's closing argument, we recount only the evidence and arguments that pertain to that issue.[6]

#### 1.    Evidence

To prove the violation of 26 U.S.C. § 5861(d), the government needed to prove that on or about September 2, 2022, Trevino knew that he possessed a "firearm" as defined by § 5845. *See Staples v. United States*, 511 U.S. 600,

---

[6] Initially, Trevino challenged the facial constitutionality of 18 U.S.C. § 922(n). But in his reply brief, he concedes that this argument fails under *United States v. Ogilvie*, 153 F.4th 1098, 1111 (10th Cir. 2025), *cert. denied*, --- S. Ct. ----, 2026 WL 490576, at *1 (Feb. 23, 2026).

602, 619 (1994). That count required proof that Trevino knew that his rifle's barrel length was less than sixteen inches.[7] *See* 26 U.S.C. § 5845(a).

Separately, to prove the violations of 18 U.S.C. § 922(n), the government needed to prove that while under felony indictment, Trevino "willfully" received ammunition on or about July 22, 2022, and on or about August 12, 2022. *See* 18 U.S.C. § 924(a)(1)(D). Each ammunition count required proof that when Trevino purchased the ammunition, he knew it was unlawful to do so. *See Bryan v. United States*, 524 U.S. 184, 196 (1998).[8]

For the short-barreled-rifle count, the government introduced compelling evidence that Trevino knew that his rifle's barrel was less than sixteen inches long. As mentioned, an agent at the ATF lab detached the flash suppressor and precisely measured the barrel at 10.62 inches. Trevino was familiar with the rifle, having built it himself and modified it to shoot different ammunition,

---

[7] Again, the indictments charge Trevino's possessing a "rifle with a barrel length less than 16 inches and an overall length less than 26 inches." R. vol. I at 24–25. Though Trevino doesn't appeal this language, we note that it doesn't match any of § 5845(a)'s definitions of "firearm." The language could implicate either of two such definitions. *Contrast* 26 U.S.C. § 5845(a)(3) ("a *rifle* having a barrel . . . less than 16 inches in length" (emphasis added)), *with id.* § 5845(a)(4) ("a *weapon made from a rifle* if such weapon as modified has an overall length of less than 26 inches *or* a barrel . . . less than 16 inches in length" (emphasis added)). The ambiguity persists in the jury instructions. *See* R. vol. I at 343 (requiring that Trevino owned "a rifle with a barrel length less than 16 inches" yet also requiring that he owned "a weapon made from a rifle with a barrel of less than 16 inches in length or an overall length of less than 26 inches").

[8] The government did not need to prove that Trevino knew the specific law or laws that made his purchases unlawful. *See Bryan*, 524 U.S. at 196–97.

which required a different barrel. Trevino's ex-girlfriend testified that Trevino had worried about moving the firearms from Texas to New Mexico and disassembled them before doing so. Trevino also periodically disassembled the rifle to clean it. And Kopp testified that Trevino told him that he had shortened the rifle's barrel. R. vol. I at 429.

Likewise, for the ammunition counts, the evidence was strong that Trevino knew that it was illegal for him to receive ammunition. The original terms of his probation in Texas had barred him from possessing "any type of firearm, prohibited weapon, or body armor." Supp. R. vol. I at 17. Just weeks before his two ammunition purchases, he signed multiple forms agreeing to New Mexico's ban on his possessing "firearms, ammunition, or other deadly weapons." *Id.* at 46, 49. And at trial, he conceded that by the time he agreed to New Mexico's conditions, he understood that it was unlawful for him to possess ammunition.

For his part, Trevino argued that he hadn't known that the barrel length was less than sixteen inches. In support, he testified that when he modified the rifle, he swapped out "a complete upper receiver," not just the barrel.[9] R. vol. I at 693. He also argued that he hadn't known that it was unlawful for him to possess ammunition. He testified that if he had known, he wouldn't have used

---

[9] On direct examination by the government, the second ATF agent agreed that the easiest way to swap out a barrel is "just [to] get another upper receiver," like Trevino said he had done. R. vol. I at 601. Otherwise, the agent said, one would need "the skills to change the barrel out by itself." *Id.*

11

his own name, debit card, and loyalty-account number at the sporting-goods store. And he noted that Texas's probation conditions did not explicitly prohibit him from possessing *ammunition*.

More controversially, Trevino sought to introduce evidence about his reobtaining the two firearms from the El Paso police—namely, (1) that the police returned the firearms to him, (2) that a property-release form listed the rifle as a "LONG RIFLE," and (3) what Trevino later told his New Mexico probation officer about the interaction.

The government objected. It argued that the forms and the probation officer's testimony would contain inadmissible hearsay, that the forms hadn't been authenticated, and that all the El Paso–police evidence was irrelevant. In the government's view, Trevino was arguing that because the police returned his firearms, the jury couldn't fairly convict him for possessing the rifle or purchasing ammunition afterward. And so, the government argued, Trevino was either making an unnotified public-authority-style defense or advocating jury nullification, neither of which was permissible.[10]

---

[10] A public-authority-style defense excuses illegal conduct based on a public official's permission or assurance of legality. *See, e.g.*, *United States v. Jumah*, 493 F.3d 868, 874–75, 874 n.4 (7th Cir. 2007). But a defendant can't mount such a defense without timely notice to the government, which Trevino hadn't given. *See* Fed. R. Crim. P. 12.3(a)(1). Nor can a defendant encourage jury nullification. *See United States v. Gonzalez*, 596 F.3d 1228, 1237 (10th Cir. 2010).

Trevino denied this. He argued that the evidence was relevant to his "state of mind" about the rifle's barrel length. *See, e.g., id.* at 553. Because the police "did not identify [the rifle] as" short-barreled but instead called it a "long rifle," he claimed that the jury might find it less likely that he knew that the barrel's length was less than sixteen inches.[11] *See id.* at 553, 575–77; Supp. R. vol. II at 1. He also briefly contended that the evidence would negate the willfulness element of the ammunition charges.

The district court mostly sustained the government's objections. The court excluded Trevino's statements to his probation officer as irrelevant and as inadmissible hearsay. And when Trevino wanted to use the release forms to cross-examine one of the ATF agents, the court excluded the forms as "irrelevant and potentially confusing for the jury." R. vol. I at 657.

But later, when Trevino took the stand, the district court allowed him to testify about his reobtaining the firearms from the El Paso police. The court also admitted the release forms.[12] Trevino read the rifle's form aloud to the

---

[11] In this exchange with the court, Trevino's counsel misstated that the release form referenced a "long-barreled rifle." R. vol. I at 576–77. He would later do so again during closing argument to the jury.

[12] We struggle to see the release forms' relevance. If Trevino already knew the rifle's barrel length when he reobtained his firearms from the El Paso police—as the government's evidence attempted to show—he could not "unknow" it just because an officer returned the firearm and described it as a "LONG RIFLE." And if he didn't already know the rifle's barrel length, the only relevance we can see would be if the forms made him less likely to measure the barrel later. But he never made such an argument.

jury: "LONG RIFLE, AMERICAN TACTICAL." *See id.* at 691; Supp. R. vol. II at 1. He testified that he hadn't known the rifle's barrel length or changed the barrel after reobtaining the rifle from the El Paso police. And without much explanation, he added that because he had thought that the police "would be able to see" his probation order, he believed that their returning his guns meant that his probation must have "been updated" to allow him to possess firearms and ammunition. *See* R. vol. I at 724–25.

### 2. Closing Arguments

Trevino's counsel began by reminding the jury that the government had the burden of proving that on or about the dates charged, Trevino knew that his rifle's barrel length was less than sixteen inches and knew that it was unlawful for him to receive ammunition. And in arguing that the government hadn't met its burden, counsel mostly stuck to safe territory. For the short-barreled-rifle count, he noted the law-enforcement officers' differing barrel measurements (though all were considerably less than sixteen inches) and Trevino's having modified the entire upper assembly rather than just the barrel. He also stressed that Trevino hadn't hidden the rifle from Kopp but had instead shown it off and gone shooting with him. For the ammunition counts, counsel emphasized that Trevino had purchased ammunition "using his name, his loyalty account, his debit card," all "because he thought he could." *Id.* at 805.

But then counsel turned to the evidence about the El Paso police. To start, he misstated the evidence by saying that the El Paso police had listed the

rifle as "long-*barreled*" on the release form.[13] *Id.* at 807–08 (emphasis added). He repeatedly reminded the jury that the police "gave [Trevino] the firearms back." *Id.* at 809; *accord id.* at 813. And he culminated by imploring, "if we can't trust that, what can we trust in the United States? . . . [W]hen the police say, 'You can make an appointment and come get your guns,' he comes and gets his guns." *Id.* at 813.

The government objected, arguing that Trevino had just asserted a public-authority defense, or one "by some other name." *Id.* At the ensuing bench conference, the court agreed, describing Trevino's argument as being, "now the police gave [the rifle] to him; it must have been okay. That's Public Authority." *Id.* The court added that "we had this discussion time and again" and "that's been your argument the last three minutes." *Id.*

Trevino's counsel agreed to "move on." *Id.* But he disclaimed making a public-authority defense, reasoning that he "vehemently den[ied]" that Trevino was admitting the crime. *Id.* at 813–14. Still, he emphasized that "if [he was] toeing the line," he would "move on from this, judge." *Id.* The court responded "[y]ou will move on from this" and told counsel that his argument was "not acceptable." *Id.*

---

[13] Again, the release form referred to the rifle as "LONG RIFLE, AMERICAN TACTICAL." Supp. R. vol. II at 1. The form says nothing about the rifle's barrel or the barrel's length.

The government then moved to strike. The court agreed, instructing the jury that it was "not an accurate statement of law" that just "because the police in El Paso gave [Trevino] the guns, it was okay for him to have the guns relative to this entire proceeding." *Id.* The court then told the jury to "have that in mind as you consider what's been said up to this point." *Id.* at 815.

## C. Conviction & Sentence

That day, the jury returned a guilty verdict on all three counts. The court imposed a mid-range sentence of eighty months' imprisonment.

## D. Appeal

Trevino timely appealed. He challenges the district court's sustaining the government's objection at closing argument and striking what the jury had just heard. In his view, the court mistook legitimate mens rea arguments for a public-authority defense. He says that this error led the court to misapply Rule 12.3 and to violate his Sixth Amendment right to present a defense. So he asks us to reverse the court's legal conclusion, vacate his conviction, and remand for a new trial.

## JURISDICTION

Trevino appeals the district court's final judgment of conviction. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review de novo a criminal defendant's argument that a district court violated his constitutional rights to present a defense. *See United States v.*

16

*Buntyn*, 104 F.4th 805, 813 (10th Cir. 2024); *United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir. 2005). But when constitutional rights aren't implicated, we review a court's limits on closing arguments like we review its other decisions about conducting trial: for abuse of discretion. *See United States v. Apperson*, 441 F.3d 1162, 1206 (10th Cir. 2006); *Ramsey v. Culpepper*, 738 F.2d 1092, 1100 (10th Cir. 1984). A court abuses its discretion when its decision "rests on an error of law or a clearly erroneous finding of fact" or "manifests a clear error in judgment." *United States v. Kirby*, 161 F.4th 1208, 1213 (10th Cir. 2025) (citation modified).[14]

## DISCUSSION

During Trevino's case in chief, the district court allowed him to testify that his reobtaining the firearms from the El Paso police lessened the likelihood that he knew the rifle's barrel length or knew that he received ammunition unlawfully. The court also allowed him to introduce the release form describing the rifle as a "LONG RIFLE, AMERICAN TACTICAL."

But in his closing remarks, Trevino's counsel went beyond arguing those points. The court correctly perceived that his argument—"if we can't trust that, what can we trust in the United States?"—proclaimed, even if unintentionally,

---

[14] We also review most constitutional errors and all nonconstitutional errors for harmlessness. *See Neder v. United States*, 527 U.S. 1, 7 (1999); *United States v. Rivera*, 900 F.2d 1462, 1469–70 (10th Cir. 1990). But as we will explain, the district court didn't err in cutting off and striking parts of Trevino's summation, so we needn't consider the rulings' harmlessness.

17

that the jury could acquit Trevino based on his reobtaining his firearms from the El Paso police, even if he knew all along that his rifle's barrel was shorter than sixteen inches and that his probation terms made it unlawful for him to receive ammunition. That was an impermissible argument. The court correctly ruled it out of bounds and instructed the jury not to consider it. We affirm.

*      *      *

Trevino insists that he wasn't making a public-authority defense but was instead trying to argue his "state of mind"—his lack of knowledge about the rifle's barrel length and the unlawfulness of his receiving ammunition. Thus, he says, the district court erred by cutting off and striking parts of his closing argument.[15]

We agree that Trevino wasn't making a public-authority defense. True, that's what the government and the district court called his argument at trial. But to assert a public-authority defense, he would have had to argue that he acted in a way he "kn[ew] to be . . . illegal but that ha[d] been authorized by the government." *Norweathers v. United States*, 133 F.4th 770, 776 (7th Cir.

---

[15] The government argues that because Trevino's counsel agreed to "move on" from the district court's cutting off his argument, Trevino abandoned, and thus waived, his objection to that ruling. We disagree. Waiver by abandonment occurs "when a party deliberately considers an issue and makes an intentional decision to forgo it." *United States v. Martinez*, 92 F.4th 1213, 1260 (10th Cir. 2024) (citation omitted). Yet by agreeing to "move on," Trevino did no more than "acknowledge[] that the district court had resolved the issue." *BonBeck Parker, LLC v. Travelers Indem. Co. of Am.*, 14 F.4th 1169, 1174 (10th Cir. 2021). He "neither agreed with the district court's resolution . . . nor suggested that [he] would not appeal" it. *Id.*

18

2025) (citation omitted); *see also Apperson*, 441 F.3d at 1204. And he never argued that.[16]

But even though the district court was wrong that Trevino was making a public-authority defense, it was right about what matters: By the time the government objected to counsel's "what can we trust?" argument, counsel was no longer arguing that Trevino hadn't known his rifle's barrel length or known that his probation condition against possessing ammunition remained in force. Instead, even if unintentionally, counsel was arguing that the jury could acquit Trevino even if he *had* known those things. That's the argument that prompted the government's objection and the court's ruling. And we affirm a district court's rulings "on any ground that finds support in the record," regardless of whether the court "reached its conclusions from a different or even erroneous course of reasoning." *United States v. Davis*, 339 F.3d 1223, 1227 (10th Cir. 2003) (citation omitted).

Recall counsel's closing remarks. True, he *began* by saying that Trevino hadn't known that the rifle's barrel was less than sixteen inches long or that the New Mexico probation condition against possessing ammunition remained in

---

[16] On appeal, the government characterizes the stricken portion of Trevino's closing argument as asserting the defense of entrapment by estoppel, not public authority. But the entrapment-by-estoppel defense requires a defendant to argue that he committed a crime only because a government official "affirmatively misle[d]" him about "the state of the law." *See Apperson*, 441 F.3d at 1204 (citation omitted). And Trevino never argued that, either.

force. For support, he relied on the El Paso police's release form describing the rifle as a "LONG RIFLE" and the testimony and receipts showing that Trevino had purchased ammunition under his own name. But then, without tying his remarks to Trevino's knowledge, counsel repeatedly stressed that *the police* had given Trevino the firearms. And right before the government objected, he asked, "if we can't trust that, what can we trust in the United States?" R. vol. I at 813.

That wasn't "a proper mens rea argument." Trevino's Open. Br. at 49. The district court had by then excluded the El Paso–police evidence for all purposes but two: Trevino could testify how the release forms affected his knowledge of the barrel's length, and he could testify how the police's returning his firearms affected his knowledge that it was unlawful to receive ammunition. In other words, by the time closing arguments began, counsel knew that "a proper mens rea argument" was one that established Trevino's lack of knowledge or willfulness.

Yet during closings, counsel tried something different. By emphasizing the need for "trust" in the police's returning the rifle, counsel subtly argued that the jury could acquit Trevino even if the government proved that he knew that his rifle's barrel length was shorter than sixteen inches or that it remained illegal for him to receive ammunition. *See* R. vol. I at 813. Rather than poke holes in the government's proof, counsel proposed a false basis for acquittal.

A district court has "considerable discretion . . . in exercising supervision over arguments of counsel." *Ramsey*, 738 F.2d at 1100 (citation omitted). Among other things, the court may "ensure that argument does not stray unduly from the mark[] or otherwise impede the fair and orderly conduct of the trial." *Herring v. New York*, 422 U.S. 853, 862 (1975). That includes the power to limit arguments that are irrelevant, confusing, or misleading. *See United States v. Wilcox*, 487 F.3d 1163, 1173 (8th Cir. 2007); *United States v. McKinley*, 70 F.3d 1307, 1314 (D.C. Cir. 1995). It also includes the power to limit arguments that misstate the law. *See United States v. Hollis*, 971 F.2d 1441, 1455 (10th Cir. 1992); *Deck v. Jenkins*, 814 F.3d 954, 981 (9th Cir. 2016).

Given that, the district court properly cut off counsel's "what can we trust" argument and struck it from the jury's consideration. When counsel misstated the jury's duty under the law, he made an improper argument. *See Hollis*, 971 F.2d at 1455. And it isn't an abuse of discretion for a court to impose reasonable limits on closing argument, including cutting off and striking improper remarks. *See id.*; *McKinley*, 70 F.3d at 1314.

Nor do reasonable limits on closing argument violate a defendant's constitutional right to present a defense.[17] *See Buntyn*, 104 F.4th at 813–14;

---

[17] The government argues that Trevino waived his constitutional argument by not specifically objecting "that the [district] court was improperly limiting his ability to put on a defense." Gov't's Resp. Br. at 54. Again, we disagree. To preserve an argument, an objection "must be sufficiently specific to bring into focus the precise nature of the alleged error." *See Antero Res.*

*(footnote continued)*

*Herring*, 422 U.S. at 862. The right to present a defense allows a defendant to "make a *proper* argument on the evidence and the *applicable* law in his favor," not to argue matters "not within the issues in the case." *See Herring*, 422 U.S. at 860 (emphasis added) (citation omitted). Because counsel's argument exceeded those bounds, Trevino had no constitutional right to the jury's considering it. *See United States v. Doe*, 705 F.3d 1134, 1149 (9th Cir. 2013).

Finally, we disagree with Trevino that the district court prevented him from making other proper arguments during closing. The court ordered Trevino not to argue that "the police gave [the rifle] to him; it must have been okay." *See* R. vol. I at 813. But the court never kept him from using the release forms to try to counter the government's proof that he knew the barrel's length. Nor did the court keep him from using his own testimony about reobtaining the firearms to try to counter the proof that he willfully received ammunition. On the contrary, earlier in the trial, the court had admitted that evidence and allowed Trevino to argue just those points. Counsel simply chose not to circle back and argue them again after the court's rulings during closing argument.

---

*Corp. v. S. Jersey Res. Grp., LLC*, 933 F.3d 1209, 1225 (10th Cir. 2019) (citation omitted). And on appeal, Trevino's two arguments rest on one purported error: the district court's misinterpreting part of his closing as an unnotified public-authority defense. That's the same error counsel identified at trial.

Nor did the district court tell the jury that "everything that it had heard about the El Paso Police Department was not relevant to its verdict."[18] Trevino's Open. Br. at 58 (citation modified). Rather, the court instructed the jury to "accept" that it was "not an accurate statement of the law" to say that "because the police in El Paso gave [Trevino] the guns, it was okay for him to have the guns." R. vol. I at 814. The court also instructed the jury to "have that in mind as you consider what's been said up to this point." *See id.* at 815. So the jury remained free to consider Trevino's earlier mens rea testimony about his reobtaining the firearms and the accompanying release forms.

## CONCLUSION

We affirm Trevino's conviction.

Entered for the Court

Gregory A. Phillips
Circuit Judge

---

[18] Though the *government* said that to the jury, Trevino never objected.